**UNITED STATES of America, et al., Plaintiffs, Appellees,**

v.

**AVX CORPORATION, et al., Defendants, Appellees.**

**National Wildlife Federation, Intervenor, Appellant.**

**No. 91–1895.**

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1992.

Decided April 21, 1992.

Eric R. Glitzenstein, with whom Katherine A. Meyer and Harmon, Curran, Gallagher & Spielberg, Washington, D.C., were on brief, for intervenor, appellant.

John A. Bryson, Atty., U.S. Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., Myles E. Flint, Deputy Asst. Atty. Gen., Ellen M. Mahan and Anne S. Almy, Attys., U.S. Dept. of Justice, Washington, D.C., were on brief, for plaintiff, appellee U.S.

Matthew T. Brock, Asst. Atty. Gen., Boston, Mass., on brief, for plaintiff, appellee Com. of Mass.

Paul B. Galvani, with whom Roscoe Trimmier, Jr. and Ropes & Gray, Boston, Mass., were on brief, for defendant, appellee Aerovox, Inc.

David A. McLaughlin and McLaughlin & Folan, P.C., New Bedford, Mass., on brief, for defendant, appellee Belleville Industries, Inc.

Before SELYA, Circuit Judge,
BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

The National Wildlife Federation (NWF), an intervenor below, tries to appeal the entry of a consent decree concerning the cleanup of New Bedford Harbor. NWF bills the appeal as one involving critical interpretive questions anent the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1988). There is, however, a prevenient issue; the original parties to the litigation contend that NWF lacks standing to maintain the appeal. Because NWF cannot push past this threshold, we dismiss for lack of appellate jurisdiction (without considering the substantive questions that lie beyond the doorstep).

I. BACKGROUND

The litigation that undergirds this appeal is nearly a decade old. In 1983, two governmental plaintiffs, the United States and the Commonwealth of Massachusetts, acting as natural resources trustees, brought suit for damages under CERCLA § 107, 42 U.S.C. § 9607, in the United States District Court for the District of Massachusetts. The complaint alleged that Aerovox, Inc., Belleville Industries, Inc., and four other defendants bore responsibility for the release of polychlorinated biphenyls into the Acushnet River and New Bedford Harbor, causing injury to natural resources. An amended complaint, filed in March 1984, added claims for recovery of costs to be incurred in remediating the river and harbor.

The subsequent course of the litigation has been much chronicled.[1] We need not retrace the district court's steps. For the purpose at hand, it suffices to say that, in 1987, NWF moved to intervene as a party plaintiff, premising its motion on the divergence between its views and the views of the plaintiffs as to the appropriate measure of damages for environmental harm. NWF professed concern that, due to this divergence in views, the plaintiffs might settle the pending action too cheaply. On April 27, 1989, the district court granted permissive intervention for the limited purpose of allowing NWF to brief and argue the following issues: (1) the legal requirements applicable to any proposed consent decree; (2) the appropriate measure of natural resource damages under CERCLA; and (3) the legal requirements for cleanup under CERCLA. *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F.Supp. 1019, 1023 (D.Mass.1989). The order permitting intervention also granted NWF the right to appeal "from a judgment it views as adverse" in respect to these issues. *Id.*

On December 18, 1990, the plaintiffs proposed a consent decree memorializing the anticipated settlement of their claims against Aerovox and Belleville. The decree provided that the settling defendants would pay $9,450,000 in response costs and $3,150,000 as compensation for injuries to natural resources in the harbor area. In exchange for this $12,600,000 cash settlement, the plaintiffs would covenant "not to

sue or to take any other civil or administrative action" against Aerovox or Belleville.

On January 7, 1991, the federal government solicited public comment on the proposed decree, 56 Fed.Reg. 535 (1991), as required by CERCLA § 122(d)(2), 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7 (1990). NWF submitted comments contending that the suggested cash-out settlement would violate CERCLA in two respects. First, NWF argued that "the proposed decree contravened [CERCLA § 122(f)] because EPA has not approved a final response action at the site."[2] Second, NWF argued that the proposed decree ran afoul of CERCLA § 122(j) because it contemplated that the defendants would obtain covenants not to sue without any assurance that they would "take appropriate actions necessary to protect and restore the natural resources damaged by such release ... of hazardous substances." 42 U.S.C. § 9622(j)(2). Unimpressed by NWF's comments, the plaintiffs pressed the district court to approve the consent decree. On July 16, 1991, the district court, *ore tenus,* overruled NWF's objections and entered the decree. This appeal followed.

Because the dispositive issue in this proceeding implicates NWF's standing to pursue its appeal, we turn immediately in that direction. NWF, an intervenor, is the lone appellant. The plaintiffs (the federal and state governments) and the settling defendants (Aerovox and Belleville) all appear as appellees, the district court having entered final judgment, Fed.R.Civ.P. 54(b), as to all claims against Aerovox and Belleville. The

---

1. The district court has written no less than eight published opinions on various aspects of the litigation. *See In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 725 F.Supp. 1264 (D.Mass.1989); *S.C.,* 722 F.Supp. 893 (D.Mass.1989); *S.C.,* 722 F.Supp. 888 (D.Mass.1989); *S.C.,* 716 F.Supp. 676 (D.Mass.1989); *S.C.,* 712 F.Supp. 1019 (D.Mass.1989); *S.C.,* 712 F.Supp. 1010 (D.Mass. 1989); *S.C.* 712 F.Supp. 994 (D.Mass.1989); *S.C.,* 675 F.Supp. 22 (D.Mass.1987). We refer the reader who hungers for more intimate details about the underlying litigation to those rescripts.

2. The statute provides that the federal government may grant covenants not to sue to CERCLA defendants

... if each of the following conditions is met:
 (A) The covenant not to sue is in the public interest.
 (B) The covenant not to sue would expedite response action consistent with the National Contingency Plan....
 (C) The [covenantee] is in full compliance with a consent decree under [CERCLA] section 9606 ... (including a consent decree entered into in accordance with this section) for response to the release or threatened release concerned.
 (D) The response action has been approved by the [Administrator of the EPA, as the President's designee].
42 U.S.C. § 9622(f)(1).

suit remains pending in the court below against other defendants.

## II. THE NECESSITY FOR STANDING

Our odyssey through the often Byzantine world of standing is greatly assisted in this instance by the Supreme Court's opinion in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). There, Dr. Diamond, a pediatrician, intervened as a defendant in a class action brought by a group of gynecologists seeking to invalidate an Illinois abortion law. Later, disappointed by an opinion of the Seventh Circuit, Dr. Diamond took an appeal to the Supreme Court in which he sought to challenge an injunction barring enforcement of certain sections of the statute. *Id.* at 61, 106 S.Ct. at 1702. He prosecuted the appeal notwithstanding that the state (on whose side he had originally intervened) chose not to pursue a further appeal. *Id.* at 56, 61, 106 S.Ct. at 1700, 1702. The Court ruled that, since the intervenor was the sole appellant, he could no longer ride the state's coattails, but must himself bear the burden of showing that he met the requirements for standing.[3] *Id.* at 63–64, 106 S.Ct. at 1703–1705. In language of unmistakable clarity, Justice Blackmun wrote that "an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." *Id.* at 68, 106 S.Ct. at 1706. *Accord Boston Tow Boat Co. v. United States*, 321 U.S. 632, 633–34, 64 S.Ct. 776, 776–77, 88 L.Ed. 975 (1944). Because he had not made the requisite showing, Dr. Diamond's appeal was dismissed for want of appellate jurisdiction. *See Diamond*, 476 U.S. at 71, 106 S.Ct. at 1708.

NWF suggests that *Diamond* is not controlling because the original parties here—the federal and state sovereigns, on the one hand, and the settling defendants, on the other hand—remain parties to the appeal. This suggestion is a prime example of a litigant allowing hope to triumph over reason. In *Diamond*, the intervenor also argued that the party on whose side he intervened—the state—remained a party to the litigation, thus keeping the original controversy alive and allowing him to derive the benefit of the state's standing. *Id.* at 63–64, 106 S.Ct. at 1703–1705. The Court squarely rejected the argument, noting that while the state's interests may theoretically have remained adverse to those of the other appellees, the state's failure to appeal the issue removed the underlying controversy upon which the intervenor had "piggyback[ed]" in the lower courts. *Id.*

So here. In the district court, the plaintiffs were seeking to maximize cleanup efforts; the defendants were hoping to minimize their financial liability. This provided the "adversariness" that rendered the question of NWF's standing academic. *See id.* at 68–69, 106 S.Ct. at 1706–1707. The entry of the consent decree, with the full support of all the settling parties, changed the calculus. While the parties to the decree are still parties to the action and to the appeal, they are now opponents in name only; in practical effect, the plaintiffs and the settling defendants no longer represent opposing interests. The underlying controversy between them has been resolved. Hence, given the case's current posture, there is no longer any extraneous support to which NWF may cling.

In point of fact, this case presents a stronger argument against continued piggybacking than the *Diamond* case. In *Diamond*, the state, while not itself appealing, had filed a letter of interest making clear that it favored the position that the appellant was endeavoring to advance. *Id.* at 61, 106 S.Ct. at 1702. Here, however, there is no such enduring confluence of interests. The parties on whose side NWF originally intervened—the federal and state sovereigns—want to preserve the very decree that NWF wants to defenestrate. They are adamantly opposed to the position that the intervenor seeks to espouse on appeal. Therefore, NWF finds itself in an

---

**3.** The Court expressly left open the question of whether a party seeking to intervene in the district court must satisfy Article III's standing requirements. *Diamond*, 476 U.S. at 68–69, 106 S.Ct. at 1706–1707.

even weaker position than that occupied by Dr. Diamond: in Thomas Wolfe's phrase, "a stranger and alone." [4]

■■■ Nor does the clause in the intervention order purporting to grant NWF the right to appeal have any significance on the threshold issue with which we must grapple. Standing is a constitutional precondition to the jurisdiction of a federal court and may not be conferred by judicial fiat upon a party who does not meet the requirements of Article III. *See Diamond,* 476 U.S. at 68, 106 S.Ct. at 1706 (while intervenors are entitled to seek review, their ability to maintain an appeal in the absence of the party on whose side they originally intervened is contingent upon meeting the requirements of Article III). Thus, an intervenor who does not actually meet the constitutional requirements for standing to appeal cannot premise standing solely upon a court order purporting to grant a right of appeal. *See United States v. Western Elec. Co.,* 900 F.2d 283, 309–10 (D.C.Cir.) (per curiam), *cert. denied,* —— U.S. ——, 111 S.Ct. 283, 112 L.Ed.2d 238 (1990).

■■■ We have said enough. This case is a *Diamond* in the rough. Consonant with the Court's teachings, we rule that an association which has intervened in the trial court and which seeks to prosecute an appeal notwithstanding that the parties on whose side it intervened have eschewed further appeals, must independently pass the test of Article III standing. Applying this precept, NWF can no longer piggyback on the plaintiffs' interests in this litigation, but must satisfy the requirements for standing if it is to maintain the instant appeal.

## III. THE REQUIREMENTS FOR STANDING

■■■ Standing poses the potential for a domino effect. If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case. *See FW/PBS v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990); *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982). Ergo, standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The inquiry into standing seeks to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.;* accord *Conservation Law Found. of N.E. v. Reilly,* 950 F.2d 38, 40 (1st Cir.1991) (*CLF/NE*). The ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical application. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760.

■■■ The constitutional limitations on standing derive from the requirement that federal courts can act only upon a justiciable case or controversy. U.S. Const. art. III. To satisfy the constitutional imperative, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. Because the constitutional imperative seeks to ensure the existence of a case or controversy by focusing on the harm to the complainant, it is unsurprising that the "personal injury" prong of the standing inquiry has received the bulk of the Court's attention. While the requisite injury may be common to many, *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 687–88, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973), it may not be shared by all. *See Warth,* 422 U.S. at 499, 95 S.Ct. at 2205; *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 2931, 41 L.Ed.2d 706 (1974). The injury must be

---

**4.** Thomas Wolfe, *Look Homeward, Angel,* foreword (1929).

real, *see Warth,* 422 U.S. at 501, 95 S.Ct. at 2206; (requiring injury to be "distinct and palpable"), but not necessarily economic; environmental or aesthetic injury can suffice in certain circumstances. *See, e.g., SCRAP,* 412 U.S. at 686, 93 S.Ct. at 2415; *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972). A mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury. *See Diamond,* 476 U.S. at 62, 106 S.Ct. at 1703 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."); *SCRAP,* 412 U.S. at 687, 93 S.Ct. at 2416 (insisting upon a showing of personal injury "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders").

■ In addition to its constitutional dimensions, the doctrine of standing also embraces prudential concerns regarding the proper exercise of federal jurisdiction. To this end, the Court has required "that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. The Court has also demanded that, as a general rule, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.[5] Finally, "the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–2206).

## IV. THE METHODOLOGY OF REVIEW

Before shining the light of these teachings on the case at hand, we pause to discuss questions of methodology.

■ The burden of adducing facts necessary to support standing rests squarely with the party seeking to avail itself of federal jurisdiction. The Court has stated the proposition unequivocally: "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth,* 422 U.S. at 518, 95 S.Ct. at 2215; *accord FW/PBS,* 493 U.S. at 231, 110 S.Ct. at 607; *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 425 (1st Cir.1983). This burden pertains in full measure to an intervenor who proposes to prosecute an appeal singlehandedly. *See Diamond,* 476 U.S. at 68, 106 S.Ct. at 1706.

In this instance, the intervenor's standing was immaterial in the lower court. Once NWF filed a notice of appeal, however, its standing (or lack thereof) took on critical importance. The appellees promptly moved to dismiss the appeal under 1st Cir.R. 27.1 (which empowers the court of appeals to dismiss an appeal for either lack of jurisdiction or lack of a substantial question). It is necessary, therefore, that we explicate the method and mode of our consideration of such a motion.

In addressing the appellees' motions to dismiss, we steer by the Court's beacon. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206; *accord Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990); *NAACP, Boston Chapter v. Harris,* 607 F.2d 514, 525 (1st Cir.1979). In practical effect, then, the standard is much the same as that traditionally applied to motions to dismiss made under Fed. R.Civ.P. 12(b)(6).[6]

---

**5.** One exception to this general rule is that associations may assert the claims of their members, provided that the members have suffered some distinct and palpable injury. We discuss this exception in greater detail *infra.*

**6.** Because the pending motions seek dismissal on the basis of the pleadings, they are highly

This formulation does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized. In connection with run-of-the-mine motions brought under Rule 12(b)(6), a reviewing court is obliged neither to "credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation," *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990), nor to honor subjective characterizations, optimistic predictions, or problematic suppositions. *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir. 1989). "[E]mpirically unverifiable" conclusions, not "logically compelled, or at least supported, by the stated facts," deserve no deference. *Id.*

Although the legal standard for reviewing a motion under Rule 12(b)(6) remains constant, the degree of specificity with which the operative facts must be stated in the pleadings varies depending on the case's context. Thus, there are various classes of cases in which we have required a heightened degree of specificity to withstand a motion to dismiss. *See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank*, 958 F.2d 15, 17 & n. 1 (1st Cir.1992); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991) ("a civil RICO complaint must, at a bare minimum, state facts sufficient to portray (i) specific instances of racketeering activity within the reach of the RICO statute and (ii) a causal nexus between that activity and the harm alleged"); *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982) (a civil rights complaint must present more

than "a general scenario which could be dominated by unpleaded facts"), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). In such contexts, the burden of articulation is not a mere formality.

This case, too, is elevated above the mine-run. Because standing is fundamental to the ability to maintain a suit, and because the Court has saddled the complainant with the burden of clearly alleging facts sufficient to ground standing, we are of the opinion that, where standing is at issue, heightened specificity is obligatory at the pleading stage. The resultant burden cannot be satisfied by purely conclusory allegations or by a Micawberish reading of a party's generalized averments. To the contrary, the proponent's pleadings "must be something more than an ingenious academic exercise in the conceivable." *SCRAP*, 412 U.S. at 688, 93 S.Ct. at 2416. The complainant must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing. *See Munoz–Mendoza*, 711 F.2d at 425 ("Where 'injury' and 'cause' are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity."); *see generally Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988) (describing minimal allegations needed, in an ordinary case, to survive Rule 12(b)(6) motion to dismiss). To borrow the Court's phrase, the facts necessary to support standing must clearly appear in the record and "cannot be 'inferred argumentatively from averments in the pleadings.'" *FW/PBS*, 493 U.S. at 231, 110 S.Ct. at 608

---

analogous to motions brought under Fed. R.Civ.P. 12(b). Courts have often treated motions to dismiss for want of standing as motions to dismiss for failure to state a claim, thus bringing them under the rubric of Rule 12(b)(6). *See, e.g., Rental Housing Assoc. of Greater Lynn v. Hills*, 548 F.2d 388, 391 (1st Cir.1977); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1360 (2d ed. 1990). We recognize, of course, as the District of Columbia Circuit has concluded, that Rule 12(b)(1) arguably provides a closer analogy. *See Hasse v. Sessions*, 835 F.2d 902, 905–07 (D.C.Cir.1987); *see also Bordell v. General Elec. Co.*, 922 F.2d 1057, 1058 (2d Cir.1991); *Cone Corp. v. Florida*

*Dep't of Transp.*, 921 F.2d 1190, 1203 n. 42 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991); *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir.1989). Nevertheless, we leave the ultimate choice between Rules 12(b)(6) and 12(b)(1) for another day. In the case at hand, none of the parties have asked us to apply the jurisprudence of Rule 12(b)(1). Moreover, considering the posture in which this case comes before us, and the fact that we have gone beyond NWF's complaint in intervention in a record-wide search for facts supporting its stance, the Rule 12(b)(6) criterion is as favorable to NWF as any other criterion that might conceivably be applied.

(quoting *Grace v. American Cent. Ins.,* 109 U.S. 278, 284, 3 S.Ct. 207, 210, 27 L.Ed. 932 (1883)).

 It is with this rubric in mind that we inquire into NWF's standing to maintain this appeal.[7]

## V. NWF'S STANDING TO APPEAL

On appeal, NWF identifies two distinct injuries which, it says, are sufficient to sustain standing. First, quoting from its motion to intervene, it alleges that its members "have been and continue to be harmed by the threats and damage to the environment and to natural resources caused by PCBs and other toxics and hazardous substances released into the New Bedford Harbor area." Second, it alleges harm to its members and other citizens attributable to the government's failure to comply with certain procedural requirements imposed by CERCLA. We consider these claims separately, after recounting some basic principles.

### A. *General Principles of Associational Standing.*

 It is well settled that, under certain circumstances, an unincorporated association may premise standing upon injuries suffered by some or all of its members. *See UAW v. Brock,* 477 U.S. 274, 281–82, 106 S.Ct. 2523, 2528–29, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977); *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211. An association has standing to sue on behalf of its members when three requisites have been fulfilled: (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the

organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals. *See Brock,* 477 U.S. at 282, 106 S.Ct. at 2528; *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441; *CLF/NE,* 950 F.2d at 41. These prerequisites for associational standing ensure that Article III's case or controversy requirement is satisfied in a given situation.

In the matter before us, affinity and personal participation are not of particular concern. There is no question that the interests which NWF seeks to safeguard are "germane to the organization's purpose." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. Likewise, nothing about the claims asserted or the relief requested seems to require the involvement of particular individuals as named plaintiffs. Thus, NWF's standing *vel non* rests on the first tine of the furcula: has NWF alleged an injury to a member sufficient to meet the requirements of Article III? Put another way, has the association shown "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit [?]" *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211–12. We believe this question, in either phrasing, must be answered in the negative.

### B. *Environmental Harm.*

NWF stated in its motion to intervene that it has "79,000 members and supporters in Massachusetts." NWF further claimed that its members "use and enjoy, through fishing, swimming, recreational and other uses, the environment and natural resources in the New Bedford Harbor [area]," and that its "members have been and will continue to be harmed by the releases that are the subject of [the] litiga-

---

**7.** We categorically reject the idea that appellees waived the right to question NWF's standing by not moving for summary judgment in the district court. Standing implicates a court's ability, consistent with the requirements of Article III, to hear a case. Thus, a defect in standing cannot be waived; it must be raised, either by the parties or by the court, whenever it becomes apparent. *See FW/PBS,* 493 U.S. at 230–31, 110

S.Ct. at 607–08. Moreover, inasmuch as permission to intervene and standing to appeal are horses of two different hues, *see Diamond,* 476 U.S. at 68–69, 106 S.Ct. at 1706–1707; *see also supra* note 3 and accompanying text, there was no reason for the appellees to challenge the intervenor's standing until the appeal eventuated in its present posture.

tion." NWF has not particularized these conclusory averments in any way. To the contrary, in a manner hauntingly reminiscent of the unsuccessful attempt of another environmental interest group to establish standing in an earlier case, *see Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, NWF makes only the most nebulous allegations regarding its members' identities and their connection to the relevant geographic area. *Compare id.* at 735 & n. 8, 92 S.Ct. at 1366 & n. 8. Gauzy generalities of this sort, unsubstantiated by any sort of factual foundation, cannot survive a motion to dismiss. *See Dartmouth Review*, 889 F.2d at 16.

To be sure, unlike the plaintiff in *Morton*, NWF does make a general allegation of actual injury to members. NWF asserts that this generalized allegation of individual harm is sufficient to withstand appellees' motions to dismiss. We disagree. The averment has no substance: the members are unidentified; their places of abode are not stated; the extent and frequency of any individual use of the affected resources is left open to surmise. In short, the asserted injury is not anchored in any relevant particulars. The intervenor's papers do not contain an averment, much less a particularized showing, of the type of "concrete injury" that we have said is needed to confer standing in an environmental suit. *CLF/NE*, 950 F.2d at 43. A barebones allegation, bereft of any vestige of a factual fleshing-out, is precisely the sort of speculative argumentation that cannot pass muster where standing is contested. *See FW/PBS*, 493 U.S. at 231, 110 S.Ct. at 607.

NWF urges that *SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, adumbrates a different result. But, although it is true that the *SCRAP* Court applied a liberal standard in reviewing claims of associational standing, *see id.* at 687–90, 93 S.Ct. at 2415–17, NWF has failed to achieve even that minimal benchmark. In *SCRAP*, the complainant, an environmental organization, sued under the Administrative Procedure Act to enjoin a rate surcharge approved by the Interstate Commerce Commission.[8] *Id.* at 685, 93 S.Ct. at 2415. The association consisted of five members, all clearly identified, who lived in metropolitan Washington. It was alleged that each member had suffered specific economic, recreational, and aesthetic harm as a result of illegal agency action, *e.g.*, they were each forced to pay more for finished products and to suffer decreased enjoyment in their use of natural resources in the immediate area of their homes due to the permitted modification in the rate structure. *Id.* at 678, 93 S.Ct. at 2411. The Court found these allegations adequate to underbrace standing. *Id.* at 689–90, 93 S.Ct. at 2416–17.

The contrast between *SCRAP* and the case before us could scarcely be more stark. In *SCRAP*, unlike here, the association consisted of a discrete number of identified individuals. In *SCRAP*, unlike here, there was a geographic nexus; all the association's members resided in a single, defined metropolitan area, directly affected by the challenged action.[9] In *SCRAP*, unlike here, economic damage to individual members was manifest. In *SCRAP*, unlike here, the claimed environmental injury was tied to the particular pursuits of particular persons. We believe these distinctions are of decretory significance. Even under *SCRAP*'s rather relaxed regime, we cannot find standing in the instant case.

■■ We note, moreover, that the Court has lately limited *SCRAP* to its particular facts, observing that *SCRAP*'s "expansive expression of what would suffice for [5 U.S.C.] § 702 review … has never since

---

**8.** The Administrative Procedure Act takes a very permissive view of standing, *see* 5 U.S.C. § 702 (1988), imposing no additional requirements beyond those inherent in Article III.

**9.** To be sure, in moving to intervene, NWF alleged that it had 79,000 "members and supporters" in Massachusetts. But, it did not name even one of them. It did not attempt to distinguish between members and non-members. It did not restrict its claims of harm to its local members. It did not mention whether any members lived in close proximity to the harbor area. When one contrasts a state the size of Massachusetts with the confined geographic area of New Bedford Harbor, it is apparent that residing in Massachusetts, without more, furnishes an inadequate basis for a claim of particularized injury.

been emulated by this Court." *Lujan,* 110 S.Ct. at 3189. In light of *Lujan,* the continued vitality of *SCRAP* as a divining rod for locating associational standing is highly questionable. When, as here, an alleged injury involves the use and enjoyment of natural resources, it is not enough, at least in the post-*Lujan* era, that a plaintiff possesses some generalized, undifferentiated interest in preserving those resources. Rather, as Professor Chemerinsky has concluded, a plaintiff, to secure standing, "must show that he or she uses the specific property in question." Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.2 (Supp. 1990). No such showing has been made in the instant case.

■ For these reasons we find NWF's allegations of environmental injury to be insufficiently specific to sustain a claim of associational standing.

### C. *Procedural Harm.*

The second part of NWF's quest for standing involves a claim that NWF's members were deprived of their full right to comment on the consent decree because the plaintiffs failed to comply with certain provisions of CERCLA. NWF argues that, since the consent decree caps the defendants' payments, it effectively determines the extent and scope of the "plan for remedial action," thereby nullifying the public's statutorily guaranteed "opportunity for submission of written and oral comments" prior to "adoption" of such a plan. 42 U.S.C. § 9617(a). As an adjunct to this theme, NWF also argues that by failing to promulgate a final cleanup plan before soliciting public comment on the proposed consent decree, the federal government has undermined the public's statutory right to provide meaningful comment on the decree prior to "its entry by the court as a final judgment." 42 U.S.C. § 9622(d)(2)(B).

■ These somewhat convoluted contentions amount to an overall claim of pro-

cedural harm. The claim comprises more cry than wool. While harm resulting from an agency's refusal to follow statutorily required procedures may in some instances constitute an actual injury sufficient to confer Article III standing, *see Defenders of Wildlife v. Lujan,* 911 F.2d 117, 121 (8th Cir.1990), *cert. granted,* ―― U.S. ――, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991); *Munoz–Mendoza,* 711 F.2d at 428; *cf. Sierra Club v. Marsh,* 872 F.2d 497, 504 (1st Cir.1989), this is not such a case.

■ 1. *Previously Addressable Harm.* In the first place, NWF appears to have waited too long to premise standing on a theory of procedural harm. Contrary to appellant's bald-faced assertions before us, its motion to intervene alleged only a claim of *environmental* harm. The closest it came to an allegation of *procedural* harm was to say in its motion that:

> There also exists, as already has been demonstrated in the proposed decree, the potential for the parties to "bargain away" the interests of NWF and its members, which is to assure that the remedy agreed to is appropriate, protective of NWF and its members, and in compliance with CERCLA.

We do not think that this general statement can be construed to assert a claim of procedural harm to NWF's members bottomed upon the denial of their right fully and effectively to comment under 42 U.S.C. §§ 9617(a), 9622(d)(2)(B). Rather, the quoted sentence, read in context, is an amplification of one of NWF's substantive arguments—nothing more.[10]

By the same token, NWF's conduct of the litigation focused exclusively on its claims of environmental harm. Its complaint in intervention sought relief only against the corporate defendants. Its response to the plaintiffs' motion for entry of the consent decree neither mentioned nor alleged abridgement of members' rights to comment. At the "decree confirmation"

**10.** Indeed, we doubt whether this type of procedural harm is consistent with, or falls within, the scope of the permitted intervention—which was limited, at NWF's own suggestion, to legal issues concerning the measure of damages, the requirements for cleanup, and the requirements for entering a consent decree. *See Acushnet,* 712 F.Supp. at 1022–23. NWF's claim of procedural harm does not appear to fit within this taxonomy.

hearing held in the district court, NWF's counsel made only substantive arguments, eschewing any reference to the incidence of a procedural injury. Because NWF failed in any way to raise the issue of procedural harm in the court below, notwithstanding that court's capability to redress such harm (if any existed), NWF cannot now be allowed to predicate appellate standing on that foundation.

2. *Absence of Actual Injury.* Even if appellant's claim of procedural harm were properly before us, it would not salvage the day.

 There is nothing talismanic about the phrase "procedural harm." A party claiming under that rubric is not relieved from compliance with the actual injury requirement for standing. *See, e.g., Munoz–Mendoza,* 711 F.2d at 425–26 (requiring, as a precondition to standing, that plaintiffs who allege procedural harm also show "injury in fact"). Thus, one who asserts procedural harm as the basis for standing must set forth particulars that serve to indicate a distinct and palpable injury. *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. Put bluntly, a party must set forth a sufficient panoply of facts to show that his injury is real as opposed to being theoretical or abstract. *See Capital Legal Found. v. Commodity Credit Corp.,* 711 F.2d 253, 258 (D.C.Cir.1983) (holding that a plaintiff's claim of injury stemming from alleged procedural harm is insufficient to ground standing where the harm is "uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public"). In the case of an association, this translates to a requirement that at least one of the organization's members is "suffering immediate or threatened injury as a result of the challenged action." *Warth,* 422 U.S. at 511, 95 S.Ct. at 2212.

 In this instance, NWF wholly failed to show, or even supportably to allege, that any member suffered a cognizable injury stemming from the supposedly inadequate opportunity to comment. A mere inability to comment effectively or fully, in and of itself, does not establish an actual injury.[11] Here, the actual injury, if there is any, can only stem from the potential for an inadequate cleanup of the New Bedford Harbor area rather than from an alleged impairment of the citizenry's right to comment. It follows ineluctably that, in order for standing to arise out of procedural harm, NWF must show that its members have suffered, or are imminently in danger of, some distinct and palpable injury flowing from the possibility of an inadequate cleanup. *Cf., e.g., Defenders of Wildlife,* 911 F.2d at 120–21 (refusal of Secretary of Interior to follow statutory consultation procedures prior to issuing new regulations regarding Endangered Species Act constituted sufficient injury for standing where plaintiff organization had established that it had members who "had visited, and planned to visit again, the endangered species or their habitat in the areas that may be affected"); *Munoz–Mendoza,* 711 F.2d at 427–28 (failure of Department of Housing and Urban Development to follow proper procedure in approving a grant constituted sufficient injury for standing only as to those plaintiffs who alleged that they lived in the affected area, that their neighborhood was currently integrated, that they had an interest in living in an integrated neighborhood, and that the grant would skew the racial mix through increased gentrification). As we have already demonstrated, *see supra* Part V(B), NWF failed to make this showing.

In short, appellant cannot make an end run around the requirement of actual injury. NWF bore a burden, to the extent its standing was dependent on a claim of procedural harm, to limn with fair specificity some concrete nexus between its members and the harbor area. Without such a nexus, any procedural harm its members suf-

---

11. We assume, for argument's sake, but without deciding, that appellant could show some curtailment in this respect. We note, however, that appellant was afforded, and vociferously exercised, a right to comment both administratively and judicially (when the district court held a hearing to consider placing its imprimatur on the decree).

fered was common to all members of the public and, therefore, did not rise to the level of stating an individualized claim of harm. *See Warth*, 422 U.S. at 499, 95 S.Ct. at 2205; *Schlesinger*, 418 U.S. at 220, 94 S.Ct. at 2931; *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.5 (1989); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure 2d* § 3531.10 (1984). Inasmuch as NWF failed to allege with the requisite particularity that any of its members risked a distinct and palpable injury if the cleanup of the harbor fared poorly, the allegation of procedural harm portrayed an injury that was both hypothetical and undifferentiated. Consequently, we find NWF's embryonic allegations of procedural harm impuissant to sustain a claim of associational standing. *See Wilderness Society v. Griles*, 824 F.2d 4, 19 (D.C.Cir.1987) (where plaintiffs lack standing to challenge an agency's substantive actions, they similarly "lack standing to challenge the procedural defects in the process that produced those actions").

## VI. CONCLUSION

To recapitulate, NWF premised its intervention into this remedial action on the divergence between its views and the views of the named plaintiffs concerning the appropriate measure of damages. NWF knew from the start that the district court action might well end in the entry of a decree with which NWF—and NWF alone—disagreed.[12] NWF was on notice that, under the clear mandate of *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, it would be unable to appeal such a decree without meeting the requirements of federal standing. Despite its knowledge of these realities, NWF chose to file a motion for intervention that contained only the vaguest and most conclusory allegations in connection with standing. And, although the appellees raised questions regarding NWF's standing in their respective responses to the motion to intervene, NWF

elected not to supplement the record or otherwise address these questions at any time during the long hiatus between the filing of its motion to intervene and the district court's approval of the consent decree. Against this backdrop of inaction, NWF can scarcely be heard to complain when an easily anticipated application of Article III results in the dismissal of its appeal.

We need go no further. Because NWF has failed, despite ample opportunity, to place in the record specific facts sufficient to support standing, its appeal must be dismissed.

*The appeal is dismissed for want of appellate jurisdiction. Costs to appellees.*

---

**12.** NWF, it must be recalled, took pains to seek and obtain a right of appeal from the district court. *See Acushnet*, 712 F.Supp. at 1023. This fact is significant because it indicates an aware-

ness, early on, that the district court proceedings might well culminate in a decree satisfactory to everyone except NWF.