In re Tyco Int'l Ltd., MDL          MDL-02-1335-B 10/14/04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

In re Tyco International, Ltd.
Multidistrict Litigation (MDL 1335)

MDL DOCKET NO. 02-1335-PB
Civil No. 02-352-PB
Derivative Action
**Opinion No. 2004 DNH 155**

MEMORANDUM AND ORDER

Shelly Evans brings this shareholder derivative action on behalf of nominal defendant Tyco International, Ltd. against all but one of Tyco's current directors and several of its former directors and officers. Asserting claims for equitable fraud, breach of fiduciary duty, and waste, Evans contends that the former officers systematically looted the company and made material false statements concerning its financial condition; the former directors knowingly, recklessly, or with gross negligence failed to prevent the looting and misstatements; and the current directors knowingly, recklessly, or with gross negligence failed

to fully disclose the wrongdoing and aggressively pursue the guilty parties.

Defendants move to dismiss Evans' complaint on the ground that she lacks standing to sue on Tyco's behalf. As I explain in this Memorandum and Order, the motions to dismiss are governed by Bermudian law and present challenges to the court's subject matter jurisdiction. Because I construe Bermudian law to bar Evans from suing on Tyco's behalf, I dismiss her complaint.

## I. BACKGROUND FACTS[1]

Evans paints a picture of "egregious corporate looting" and "monumental accounting improprieties" at Tyco during the time that defendant Dennis Kozlowski served as the company's chief executive officer. She charges that Kozlowski, defendant Mark Swartz, Tyco's former chief financial officer, and Mark Belnick, the company's former general counsel, looted the company of hundreds of millions of dollars in unauthorized and undisclosed compensation, benefits, and loans. She also claims that these

---

[1] Evans outlines her claims in a 162-page complaint. I provide only a brief sketch of her allegations here and discuss specific allegations later to the extent that they are material to my analysis.

defendants and others affiliated with Tyco made numerous false public statements about the company's finances and engaged in fraudulent accounting practices. She charges that this misconduct has seriously undermined Tyco's value and has exposed it to billions of dollars in potential liabilities as a result of lawsuits brought against the company by disgruntled shareholders.

Evans also asserts that the board of directors that was in place during Kozlowski's tenure was hopelessly compromised by financial entanglements with the company and its senior management. As a result, she claims the former board member defendants knowingly, recklessly, or with gross negligence permitted Tyco's senior management to loot the company and create a false public impression about the company's financial condition.

Kozlowski was forced to resign in the summer of 2002 after he was indicted for allegedly evading approximately $1 million in New York state sales taxes. Additional indictments against Kozlowski, Swartz, and Belnick soon followed. On July 25, 2002, the board chose defendant Edward Breen to serve as Tyco's new chief executive officer. Soon thereafter the company began to

appoint new directors.  By March 6, 2003, the entire board had been replaced.

Evans charges that Breen and the other current directors knowingly, recklessly, or with gross negligence failed to accurately disclose the full extent of the past misconduct at Tyco.  She alleges that they authorized the expenditure of tens of millions of dollars for incomplete and misleading outside investigations that significantly understated the extent of the misconduct.  She claims that Breen and the other directors then used the results of these investigations to create a misleading picture of Tyco's financial condition in order to obtain needed financing for the company and to preserve the value of their stock options and other benefits.  She also asserts that the current directors caused Tyco to file lawsuits against Kozlowski, Swartz, and Belnick to shift responsibility for the past misconduct from the former board to its former officers and to minimize public perceptions concerning the extent of the misconduct.  Evans particularly faults the current directors for: (1) failing to earlier disclose approximately $1.6 billion in charges that Tyco announced in March and April of 2003; (2) making misleading statements to shareholders in connection with a

proposal to change Tyco's place of incorporation from Bermuda to Delaware; (3) approving the payment of $92 million to maintain liability insurance for Tyco's former officers and directors; (4) failing to timely disclose additional charges that were eventually required in response to a Securities and Exchange Commission investigation; and (5) failing to aggressively pursue claims against former officers and directors other than Kozlowski, Swartz, and Belnick.

## II.  CHOICE OF LAW

The parties agree that Evans' right to sue on Tyco's behalf is governed by the law of Bermuda, the place of Tyco's incorporation.[2]  They also agree that because Bermudian law in this area is undeveloped, courts in Bermuda would look primarily to English common law to resolve the questions that are now

---

[2]  Bermudian law applies because the forum state's choice of law rules govern this diversity of citizenship case, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941), and New Hampshire law specifies that a shareholder's ability to bring a derivative action is determined by using the law of the corporation's place of incorporation, N.H. Rev. Stat. Ann. § 293-A:7.47 (1999).

before me.[3]  I accept these agreements and accordingly evaluate Evans' right to sue on Tyco's behalf under English law as it would be applied by a Bermudian court.

### III.  STANDARD OF REVIEW

Under English law, whether Evans is a proper plaintiff to sue on Tyco's behalf is viewed as a question of standing.  Paul L. Davies, Gower and Davie's Principles of Modern Company Law 453 (7th ed. 2003); Elizabeth J. Boros, Minority Shareholders' Remedies 184 (1995); A.J. Boyle, Minority Shareholders' Remedies 8 (2002).  American courts, in turn, generally view standing as a component of subject matter jurisdiction.  See, e.g., Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1280-81 (1st Cir. 1996).  Further, most standing challenges are analyzed under Fed. R. Civ. P. 12(b)(1).  See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001) (stating that justiciability issues should be analyzed under Rule 12(b)(1)); United States v. AVX

---

[3]  Evans argues that courts in Bermuda are also free to consider the law of other Commonwealth countries when answering unresolved legal issues.  I agree and thus look to precedents in other Commonwealth countries to the extent that they are persuasive.

<u>Corp.</u>, 962 F.2d 108, 114 n.6 (1st Cir. 1992) (leaving issue open but noting that Rule 12(b)(1) arguably is the preferred rule for analyzing standing questions); <u>see also</u> <u>Colo. Envtl. Coalition v. Wenker</u>, 353 F.3d 1221, 1227 (10th Cir. 2004) (analyzing standing question under Rule 12(b)(1)).  Because I see no reason to deviate from the generally accepted practice,[4] I review the motions to dismiss under Rule 12(b)(1).

Circuit precedent directs a district court to consider a Rule 12(b)(1) challenge in one of three ways depending upon the

---

[4]  Tyco argues that English law requires Evans to make out a *prima facie* case that she is entitled to sue on Tyco's behalf before she may proceed with her claim.  <u>See, e.g.</u>, <u>Prudential Assurance Co. v. Newman Indus. Ltd.</u>, [1982] Ch. 204 (Eng. C.A. 1981) (recognizing requirement).  This burden is more than a pleading burden, according to Tyco: it requires evidence.  <u>See, e.g.</u>, Civ. P. R. 19.9 (U.K. 1998) (requiring court permission to proceed with a derivative action and directing the plaintiff to produce "written evidence" in support of her standing claim).  Relying on these principles and its contention that Evans cannot produce sufficient evidence to demonstrate that she has standing to sue, Tyco argues that I should dismiss the case without relying on any American procedural rule.  I decline to follow this path and instead conclude that Rule 12(b)(1) provides the rubric for determining Evans' standing to bring her claim.  While, as I explain, Rule 12(b)(1) requires a plaintiff to produce evidence in support of her claim when her standing to sue is challenged and material jurisdictional facts are in dispute, I need not consider evidence to resolve the standing issue in this case because Evans lacks standing even if all of her properly pleaded averments of jurisdictional fact are true.

-7-

nature of the jurisdictional contest. If there are no factual disputes that are material to the jurisdictional issue, the court should accept the plaintiff's well-pleaded factual averments, construe them favorably to the plaintiff, and resolve the issue. See Valentin, 254 F.3d at 363. Alternatively, if material jurisdictional facts are disputed, the court must resolve the factual disputes before it can determine whether jurisdiction exists. See id. If the disputed jurisdictional facts are separable from the merits, the court should resolve the jurisdictional question immediately. See id. If, instead, the jurisdictional dispute is inextricably intertwined with the merits, the court may be required to leave the standing question unresolved until the time of trial. See id. at 363 n.3.

I resolve the standing question presented by the motions to dismiss without engaging in jurisdictional fact finding because I conclude that I lack subject matter jurisdiction even if all of Evans' well-pleaded jurisdictional averments are true. In doing so, I am mindful both that Evans ultimately must prove that she has standing to sue, See People to End Homelessness, Inc. v. Derelco Singles Apartments Assoc., 339 F.3d 1, 8-9 (1st Cir. 2003), and that I need not credit conclusory assertions in her

complaint to the extent that they are inconsistent with specifically pleaded or undisputed facts. See AVX Corp., 962 F.2d at 115 (analyzing standing question under Fed. R. Civ. P. 12(b)(6)); Robinson v. Gov't of Malaysia, 269 F.3d 133, 146 (2d Cir. 2001).

## IV.  DISCUSSION

### A.  The Rule in *Foss v. Harbottle*

A shareholder's standing to sue on behalf of a corporation under English law is governed by "the rule in Foss v. Harbottle." See, e.g., Davies, supra, at 444; K.W. Wedderburn, Shareholders' Rights and the Rule in Foss v. Harbottle, 1957 Cambridge L.J. 194.  The rule is derived from an 1843 court case of the same name.  See Foss v. Harbottle 2 Hare 461 (Eng. 1843).  For our purposes, the rule can be stated as follows:  a shareholder may ordinarily bring a derivative claim on behalf of a corporation only if a simple majority of the shareholders could not ratify the conduct on which the suit is based.[5]  Underlying the rule is

---

[5]  In its classic formulation, the rule is said to consist of two related rules:

First, the proper plaintiff in an action in respect of

-9-

a commitment to the principle of majority rule with respect to matters of ordinary corporate governance.  See Wedderburn, supra, at 197-98.

The rule in Foss v. Harbottle is subject to four "exceptions" which permit a shareholder to bring suit when the conduct at issue is:  (1) *ultra vires*; (2) requires a special majority to ratify; (3) infringes a shareholder's personal rights; or (4) qualifies as a "fraud on the minority."  See Edwards, [1950] 2 All E.R. 1064.  Although it has been suggested that these are not true exceptions because a shareholder's suit to protect her personal rights is not brought as a derivative action and the other three exceptions merely describe circumstances in which a derivative action is permitted because

> a wrong alleged to be done to company or association of persons is *prima facie* the company or the association of persons itself.  Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favor of what has been done, then *cadit quaestio* [there is an end to the argument].

Edwards v. Halliwell, [1950] 2 All E.R. 1064, at 1066 (C.A. 1950).

the conduct on which action is based cannot be ratified by a simple majority, see Davies, supra, at 450; Wedderburn, supra, at 203, I follow the conventional approach and analyze them as exceptions.

Evans' relies primarily on the fraud on the minority exception, although she also invokes the *ultra vires* exception and argues for the recognition of an "interests of justice" exception. I address her arguments in turn.

### 1. Fraud on the Minority

It has been said that "[w]hen it comes to real confusion, there is probably nothing to approach the familiar but slippery expression, 'fraud on the minority' . . . ." L.S. Sealy, Problems of Standing, Pleading and Proof in Corporate Litigation, in Company Law in Change: Current Legal Problems 1, 10 (B.G. Pettet ed. 1987). The exception has two elements that work together to limit the circumstances in which a minority shareholder may seize control of the company's right to sue. The first is that the alleged wrongdoers must have "control" over a majority of the stock with voting rights and the second is that the wrongdoers must have committed "fraud." See K.W. Wedderburn,

, 1958 Cambridge L.J. 93, 93-94. These labels are deceptively simple, however, because, as the cases that have considered the exceptions demonstrate, neither actual control nor fraud as we traditionally understand the term is required to qualify under the exception.

a. Control

English courts have struggled to develop a workable concept of control in this context. In Prudential, [1982] Ch. 204, at 219, the most influential modern case that addresses the issue, the court of appeal noted in dictum that the concept of control "embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end made up of those likely to be cast . . . as a result of influence or apathy." The court went on to suggest that rather than attempt to make a judgment about control without adequate information, "it may well be right for the judge trying the preliminary issue [as to whether the plaintiff has standing] to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a

conclusion in the light of the conduct of, and proceedings at, that meeting." Id. at 222. I read Prudential to support the view that a corporation's board of directors will be deemed to have control of a majority of the corporation's voting shares for purposes of the fraud on the minority exception if the evidence demonstrates that it has acquired *de facto* control. Because I have not undertaken a factual inquiry into this issue, I will assume for purposes of analysis that Evans is correct in claiming that the current board has acquired *de facto* control.

b. Fraud

The fraud on the minority exception does not require proof of fraud as an American court would understand the term. Instead, English courts speak of fraud in this context in a broader equitable sense in which control is misused to benefit the wrongdoers at the company's expense. See, e.g., Konamaneni v. Rolls Royce (India) Ltd., [2002] 1 W.L.R. 1269, at 1278 (Eng. Ch. 2001); Estmanco (Kilner House) Ltd. v. Greater London Council, [1982] 1 All E.R. 437 (Ch. 1982). While one court has gone so far as to suggest that negligent conduct may qualify as fraud in certain circumstances, see Daniels v. Daniels, [1978]

Ch. 406, 414 (Eng. 1977), that court and virtually all other courts that have applied the exception recognize that fraud is not present unless the alleged wrongdoer has benefitted at the company's expense as a result of his midconduct. See, e.g., id.; Clark v. Energia Global Int'l, Ltd., [2001] No. 173, at 10 (Berm.) ("'[f]raud on the minority' means there has been some element of misappropriation of company property"). Thus, English law, unlike its American counterpart, does not permit a derivative action to be maintained to remedy a breach of fiduciary duty that does not involve self-dealing by those in control.[6] See, Miller, supra, at 62. Accordingly, I examine

---

[6] American law typically limits derivative actions by imposing a demand requirement, see, e.g., 19 Am. Jur. 2d Corporations §§ 1960-74 (2004); 18 C.J.S. Corporations § 407 (1990), and by enforcing the business judgement rule, see, e.g., 19 Am. Jur. 2d Corporations §§ 1975-78 (2004); 18 C.J.S. Corporations § 400 (1990). English law generally requires proof that the alleged wrongdoers are in control and have engaged in improper self-dealing. See, e.g., Geoffrey Miller, Political Structure and Corporate Governance: Some Points of Contrast Between the United States and England, 1998 Colum. Bus. L. Rev. 52, 61-63. These differences result in a somewhat tighter screen for derivative claims under English law. The differences between the two jurisdictions are likely due to the fact that English courts attach somewhat greater importance to the principle of majority rule and are somewhat more skeptical about the efficiency of shareholder litigation as a means of controlling improper behavior by directors. See id. at 53, 60-63, 68-69.

Evans' attempt to invoke the fraud on the minority exception by looking to the sufficiency of her allegations that the current directors have engaged in improper self-dealing at Tyco's expense.

c.  Analysis

Although Evans has sued several of Tyco's former directors and officers as well as the company's current directors, her standing to maintain each of her claims depend upon the sufficiency of her allegations that the current directors have engaged in fraud on the minority.  This is necessarily so because it is the current board's litigation judgment that she seeks to displace.  Thus, I turn to her allegations that the current directors have engaged in fraud.

Evans claims that the current directors have breached their duties to Tyco and its shareholders in a variety of ways.  Apart from defendant Breen, however, who arguably is in a different position because of his status as Tyco's chief executive officer, Evans does not allege the kind of self-dealing by the current directors that is necessary to satisfy the fraud requirement.  At most, she claims that the current directors are compromised by

the need to "(i) . . . protect [their] own financial interests in maintaining an artificially inflated value for their stock options, (ii) to avoid personal liability, (iii) to avoid damage to their personal reputations, and (iv) to perpetuate the myth that they are 'cleaning up' Tyco and restoring its credibility and integrity." (Comp. at ¶ 437.) None of these allegations, however, qualify as improper self-dealing. It is difficult to see how the receipt of stock options can constitute improper self-dealing, at least in a case such as this where the plaintiff does not allege either that the options were unearned or that the directors stood to gain in some special way from increases in the company's stock price at the expense of other shareholders. Nor can a board's decision to prevent the company from suing its directors qualify as improper self-dealing. The directors of a corporation *always* have an interest in avoiding the personal liability and damage to their reputations that could result from a breach of fiduciary duty lawsuit. If allegations of this sort could satisfy the self-dealing component of a fraud on the minority claim, the requirement would be meaningless because it would be satisfied in every derivative action in which a breach

of fiduciary duty claim is asserted against a sitting board of directors. Such an interpretation defies both precedent and reason and must be rejected.[7] <u>See, e.g.</u>, <u>Barrett v. Duckett</u>, [1995] 1 B.C.L.C. 243 (Engl. C.A. 1994) (unauthorized directors pay sought as damages); <u>Burland v. Earle</u>, [1902] A.C. 83 (P.C. 1901) (appeal taken from Ontario) (authorized salary not disputed, but additional sums taken at the company's expense were disputed); <u>see also</u> <u>Grobow v. Perot</u>, 539 A.2d 180, 188 (Del. 1988) (directors' normal fees and emoluments not sufficient to create a financial interest).

Evans makes a distinct fraud argument with respect to Breen because, as Tyco's chief executive officer, he has received substantial salary, bonuses, stock options, and other benefits from Tyco that could be at risk if, as Evans charges, Breen falsely certified Tyco's financial statements pursuant to a scheme to conceal the company's true financial condition and

---

[7] In a supplemental memorandum, plaintiff argues the current board received an additional benefit by re-authorizing Tyco's D&O and fiduciary liability coverage for current board members as well as for the company's former officers and directors. (Pl. Resp. to Questions at 9). This benefit fails to fulfill the self-dealing requirement for the same reasons given above: it is not an additional benefit beyond the normal emoluments of office.

-17-

thereby retain unearned employment benefits.[8]  Even if I accept Evans' argument that Breen's alleged actions qualify as the kind of self-dealing that is sufficient to support a fraud on the minority claim, her standing argument fails because she has not also sufficiently alleged that Breen controls either a majority of the votes on the board of directors or otherwise controls a majority of Tyco's stock.  See Daniels, [1978] Ch. at 414 (explaining that prior case rejecting derivative action was properly decided "because in that case the powers of the directors were effectively wielded not by the director who benefitted but by the majority of independent directors who were acting bona fide and did not benefit").

In summary, if I assume that Evans has sufficiently alleged that the current board has acquired control over a majority of Tyco's voting stock, her attempt to rely on the fraud on the minority exception fails because she has not sufficiently pleaded her claim that the current directors have engaged in fraud.

_____

[8]  Under 15 U.S.C. § 7243, a corporation's chief executive officer could be required to return certain compensation and stock sale profits that one earned in the 12 months following issue of certain financial documents that must later be restated because of misconduct.

Alternatively, if I assume that she has sufficiently pleaded a claim that Breen has engaged in fraud, her claim still fails because she has not sufficiently pleaded that Breen has acquired control over a majority of Tyco's voting stock. Stated differently, Evans' cannot rely on the fraud on the minority exception because she has not sufficiently pleaded a claim that those who currently control the company are compromised by the kind of self-dealing at the company's expense that is required to support a claim based on the exception.[9]

---

[9] Evans argues that I should deviate from English and Bermudian precedents where necessary to bring the rule in Foss v. Harbottle in line with "modern legal thought." Although the rule in Foss v. Harbottle is more than 150 years old, it continues to be applied in English and Bermudian courts despite scholarly criticism, see, e.g., Sealy, supra, and proposals to displace it with a statutory cause of action, see, e.g., Boyle, supra, at 60-89. While all common law rules must evolve in the face of changing experience, "modern legal thought" cannot be permitted to become a euphemism for American law. The English law of derivative actions is premised on a view of the importance of preserving majority rule in corporate governance that should not be lightly disregarded merely because it may conflict with the relatively greater importance that American law assigns to the protection of minority shareholder rights. Because I conclude that English and Bermudian courts would not do what Evans requests, I decline to rewrite the English common law of derivative actions to support her right to sue.

## 2. *Ultra Vires*

Evans devotes only a single paragraph to her argument that her case qualifies under the *ultra vires* exception. She argues that the exception applies because the current directors have caused Tyco to make false and misleading statements about the company's financial condition. Such illegal acts, she reasons, necessarily are *ultra vires*. Tyco responds by arguing that the company is required to make statements about its financial condition and that such statements are not *ultra vires* even if they are false.

I need not take a position on this issue to dispose of Evans' attempt to invoke the *ultra vires* exception. The short answer to her poorly developed argument is that both English and Bermudian courts have recognized that when a shareholder seeks to bring a derivative action to recover damages for past *ultra vires* acts, the shareholder must demonstrate that the case qualifies under the fraud on the minority exception. See Clark, [2001] No. 173 at 11; Smith v. Croft (No.2), [1988] Ch. 114, 172-73 (Eng. 1986). Because, as I have explained, Evans has not sufficiently

pleaded fraud on the minority, her attempt to rely on the *ultra vires* exception also fails.

### 3. Interests of Justice

Evans argues that there is a fifth exception to the rule in Foss v. Harbottle for cases in which the interests of justice require the allowance of a derivative claim. Her argument draws weight from dicta found in Edwards v. Halliwell, where the court stated that the rule is "not an inflexible rule and it will be relaxed where necessary in the interests of justice." [1950] 2 All E.R. at 1067. This sentiment has been echoed recently in the Chancery court, Prudential Assurance Co. v. Newman Indus. Ltd. (No.2), [1981] Ch. 257, 323-27 (Eng. 1979), and by the Supreme Court of New South Wales, Mesenberg v. Cord Industrial Recruiters Pty Ltd., (1996) 130 F.L.R. 180 (Austl.). But even these courts hedge their bets in citing the interests of justice as a distinct exception to the rule in Foss v. Harbottle. See, e.g., Mesenberg, 130 F.L.R. at 184 (referring to the "so-called fifth exception" based on Edwards v. Halliwell and stating that "[a]lthough there is doubt as to whether this exception is part of the law, there are weighty judgements which, *despite*

*indications of doubt*, would conceive that it *might* exist . . . .") (emphasis added). Such commentary is hardly a ringing endorsement for the existence of a fifth exception. Moreover, the Chancery court's reliance on the exception in Prudential was rejected by the Court of Appeal which stated it was "not convinced" that an exception to the rule in Foss v. Harbottle "whenever the justice of the case so requires" was a practical test. Prudential, [1982] Ch. 204 at 221; see also Konamaneni, [2002] 1 W.L.R. at 1283 (stating that after the Prudential case there is no justification for the assumption that there is a general exception to the rule in Foss v. Harbottle where the interest of justice so require); Estmanco, [1982] 1 All E.R. 437 ("I do not think that it can simply be said that there is an exception from the rule whenever the justice of the case requires it. . . . [T]he Court of Appeal [in Prudential] . . . observed that this was 'not a practical test' . . . and I would respectfully concur").

While I share the skepticism expressed by the Court of Appeal about the viability of a distinct interests of justice exception, I need not decide whether a Bermudian court would ever

-22-

recognize such an exception because I am satisfied that the exception is unnecessary in this case.  As I have explained, Evans has not sufficiently alleged that the current board's independence is compromised by self-dealing or improper entanglements with the company's former officers and directors.  Moreover, while it is possible to question the motivation, completeness and timing of many of the board's activities, it is undisputed that Tyco is aggressively prosecuting claims against Kozlowski, Swartz and Belnick and has undertaken substantial efforts to identify and disclose adverse information concerning the company's financial condition.  In short, this case does not present the kind of egregious misconduct by a self-interested board of directors that would compel a Bermudian court to deviate from the principle of majority control that underlies the rule in Foss v. Harbottle.

## Conclusion

Because Evans has failed to demonstrate that her case comes within an exception to the rule in Foss v. Harbottle, I determine that she lacks standing to bring a derivative claim on Tyco's

behalf.  Accordingly, I grant the defendants' motions to dismiss (Doc. No. 122, 129, 130, 142, 143, 144).

**SO ORDERED.**


_____
Paul Barbadoro
Chief Judge

October 14, 2004

cc:  Counsel of Record