UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1699

LYDIA LIBERTAD, ET AL.,

Plaintiffs - Appellants,

v.

FATHER PATRICK WELCH, ET AL.,

Defendants - Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. H ctor M. Laffitte, U.S. District Judge]

Before

Torruella, Chief Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

Catherine Albisa, with whom Judith Berkan was on brief for
appellants.
Mathew D. Staver, with whom Frederick H. Nelson and Nicole
M. Arfaras, were on brief for appellees Ed Martin, Donald
Treshman and Rescue America.
Miguel A. Gim nez-Mu oz and Cordero, Miranda & Pinto on
brief for appellees Father Patrick Welch and Norman Weslin.

April 28, 1995


TORRUELLA, Chief Judge. A group of individuals and TORRUELLA, Chief Judge.

organizations representing women who have sought or will seek

family planning services in Puerto Rico ("Appellants") brought

this action against certain individuals and organizations

("Appellees") who oppose abortion and coordinate anti-abortion

demonstrations at women's health clinics in Puerto Rico. The

Appellants appeal from the district court's grant of summary

judgment disposing of their claims brought under 1962(c) and

(d) of the Racketeer Influenced and Corrupt Organizations Act,

("RICO"), 18 U.S.C. 1961 et seq. (1984), and the "hindrance

clause" of 42 U.S.C. 1985(3) (1981).1 In granting summary

judgment for Appellees, the district court ruled: 1) that

Appellants' claims brought under 1962(c) and (d) of RICO

failed because Appellants did not show either the existence of an

enterprise or a pattern of racketeering activity; and 2) that

Appellants' claims brought under the "hindrance clause" of the

"Ku Klux Klan Act," 42 U.S.C. 1985(3), failed because

Appellants did not show "that the purpose of [Appellees'] alleged

conspiracy was to prevent or hinder law enforcement officers from

giving or securing to women their right to seek abortions." For

the following reasons, we affirm in part and reverse in part.

I. BACKGROUND I. BACKGROUND

A. The Parties A. The Parties



1 Appellants also brought several pendant state law claims for
negligence, nuisance, and illegal use of amplifiers and
loudspeakers, which the district court dismissed without
prejudice. Those claims are not before us.

-2-

Appellants initiated this action on behalf of women

seeking reproductive health services and their health care

providers. Among the named plaintiffs are two women using the

pseudonyms "Lydia Libertad" and "Emilia Emancipaci n." Both

Libertad and Emancipaci n are Puerto Rico residents and have

sought reproductive health services on the island. Another

plaintiff, Rosa C ceres, is the Clinic Administrator at the

Women's Metropolitan Clinic ("WMC") in R o Piedras, Puerto Rico,

which provides a range of reproductive health services including

abortion. WMC is owned in turn by plaintiff Oficinas M dicas.

Plaintiff Mary Rivera is the Clinic Supervisor and Director of

Counselling at the Cl nica Gineco-Quir rgica, ("Cl nica") which

also provides reproductive health services including abortion.

Plaintiffs Ana E. Gonz lez-D vila ("Gonz lez") and Dr. Rafael E.

Castro-De Jes s ("Castro") are, respectively, the administrator

and the medical director of plaintiff Ladies Medical Center

("LMC"), which also provides reproductive health services

including abortion. The Grupo Pro Derechos Reproductivos, an

abortion rights organization, is also a plaintiff.

Defendant Father Patrick Welch is the head of the anti-

abortion rights organization Pro-Life Rescue Team ("PLRT"), also

a named defendant. Defendants Donald Treshman and Reverend Ed

Martin are, respectively, the National Director and the Executive

Director of defendant Rescue America, a nationwide anti-abortion

rights group based in Houston. Defendant Norman Weslin is the

director of the defendant anti-abortion rights group the

-3-

Sacrificial Lambs of Christ ("SLC"). Defendant Carlos S nchez is

a member of the anti-abortion rights group Pro-Vida.

B. Events Leading to this Action B. Events Leading to this Action

We present the facts here in the light most favorable

to the Appellants. See Maldonado-Denis v. Castillo-Rodr guez, 23

F.3d 576, 581 (1st Cir. 1994) (when reviewing grant of summary

judgment, record is examined in light most favorable to

nonmovant). Some or all of the Appellees staged protest

demonstrations, which they refer to as "rescues," at the

plaintiff clinics on five occasions: September 26, 1992,

September 28, 1992, December 17, 1992, December 24, 1992, and

January 8, 1993. During each of the five protests, Appellees

blockaded the clinics so that clinic personnel and patients could

not enter. Each blockade was carried out in a similar manner.

Typically, the protests began before the clinics opened, with

Appellees blocking access to the clinics and parking lots by

physically obstructing the entrances, linking their arms tightly

together and refusing to allow anyone to pass through. Outside,

the protesters shouted slogans through megaphones to clinic

personnel and patients, told patients that they were "murderers,"

screamed insults at clinic personnel, and videotaped or

photographed people as they attempted to enter and leave the

clinics. The protesters also defaced the clinic property by

affixing difficult-to-remove stickers depicting fetuses on the

walls and entrances, and by scrawling graffiti on the clinic

walls. During these blockades, litter was strewn around clinic

-4-

property and on the properties of surrounding businesses. In

addition to effectively shutting down the clinics for all or part

of a day, these protests caused extensive and costly property

damage to the clinics.

Appellee Welch and some of the minor children who

protest with him have on occasion entered the clinics and

intimidated or harassed patients and staff. On September 26,

1992, Welch invaded the LMC and pushed plaintiff Gonz lez from

the clinic entrance all the way through the waiting room to the

back office, trapping her there for a number of hours. On

September 28, 1992, Welch and a young girl entered one of the

clinics and remained in the waiting room, despite being told to

leave by clinic staff. Patients with appointments would enter

and then leave when they recognized Welch in the waiting room.

Eventually, the police had to come and remove Welch and the young

girl.

The record indicates that of the five protests at issue

in this case, the January 8, 1993 protest is the only one at

which all of the Appellees, not just Welch and his followers,

participated. The tactics employed on January 8 were

considerably more aggressive. In addition to the above-mentioned

blockade methods, Appellees also blocked clinic access by parking

buses in front of clinic entrances and then refusing to move them

when instructed to do so by the police. Appellees chain-locked a

clinic entrance and then covered the lock with tape to prevent it

from being pried open. One clinic supporter received a death

-5-

threat from a protester. The clinic suffered considerable

property damage as well; locks were filled with glue or gum, and

gates were broken or otherwise damaged to prevent entry.

When the police attempted to arrest protesters on

January 8, many protesters climbed under the motor vehicles to

avoid arrest. Demonstrators also used other delay tactics, such

as going limp when police arrested them, or lying down on the

ground and locking arms, thus making it nearly impossible for the

officers to physically remove them from the clinic property.

The evidence also indicates that some protesters actively

resisted arrest by assaulting officers, or by flailing their arms

to make the officer's task more difficult and time-consuming. At

one blockade, protesters poured acid in a police van in which

several arrestees were held, necessitating that they be taken out

of the van and further delaying the police.

The blockades demand that local law enforcement

officials expend a significant amount of time and resources;

between forty-five and sixty officers are usually deployed for

each protest. Law enforcement officials testified that they are

overwhelmed by the protesters' tactics, that they are unable to

either deter the blockades or keep the clinics open during the

blockades.

Some Appellees explained during depositions and at the

hearing that one reason for these tactics is to "buy time" for

the "unborn" -- i.e., to delay their arrests, thereby prolonging

the blockade of the clinic and delaying or preventing the clinic

-6-

from resuming its business, particularly the performance of

abortions.

C. Procedural History C. Procedural History

On January 8, 1993, Appellants filed the instant action

seeking a temporary restraining order, a preliminary injunction,

and a permanent injunction enjoining Appellees from using

unlawful force, harassment, intimidation, and physical

obstruction during their protests in front of Puerto Rico

clinics. The district court denied the motion for a temporary

restraining order, but held a hearing from February 4-9, 1993 on

Appellants' request for a preliminary injunction, during which

extensive testimonial and documentary evidence was presented by

both parties.

On February 9, 1993, during the hearing, Appellees'

counsel moved for dismissal of the complaint as to defendants SLC

and Rescue America on the grounds of defective service of

process.2 The court examined the record and found that service

on these defendants was defective because the summons failed to

state the name of the person served. The court attempted to have

the U.S. Marshal who had served the summons called into court to

testify, but the Marshal was unavailable. The court did not rule

at that time on the defective service of process issue, but

advised Appellants' counsel to "inquire" about the problem. At



2 Significantly, counsel for SLC and Rescue America was present
at the hearing, as well as all other court proceedings, and made
a general appearance in the case, rather than a special limited
appearance to contest proper service.

-7-

the hearing's close, the court ordered the parties to submit

post-hearing briefs.

On November 1, 1993, the district court denied the

preliminary injunction, ruling that Appellants had not

demonstrated a reasonable likelihood of success on the merits of

their complaint, and that there existed no genuine dispute of

material facts. The court converted the Appellees' motions to

dismiss into motions for summary judgment pursuant to Fed. R.

Civ. P. 12(c), and ordered Appellants to show cause why summary

judgment should not be entered. Accordingly, on December 30,

1993, Appellants filed their opposition to summary judgment

accompanied by a statement alleging disputed material facts.

In March of 1994, responding to perceived threats by

Appellees to begin another round of blockades and protests,

Appellants filed a motion renewing their request for injunctive

relief. On May 3, 1994, the court denied this request, and

granted summary judgment in Appellees' favor. Specifically, the

court held 1) that Appellants' claims brought under 1962(c)

and (d) of RICO failed because Appellants did not show either the

existence of an enterprise or a pattern of racketeering activity;

and 2) that Appellants' claims brought under the "hindrance

clause" of 42 U.S.C. 1985(3) failed because Appellants did not

show "that the purpose of [Appellees'] alleged conspiracy was to

prevent or hinder law enforcement officers from giving or

securing to women their right to seek abortions." In the same

order, the court dismissed the claims against Rescue America and

-8-

SLC on the grounds of defective service of process.

II. PRELIMINARY DISCUSSION II. PRELIMINARY DISCUSSION

A. Standard of Review A. Standard of Review

Summary judgment is appropriate when "there is no

genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). We review a grant of summary judgment de novo, examining

the entire record in the light most favorable to the nonmovant

and indulging all reasonable inferences in that party's favor.

Maldonado-Denis, 23 F.3d at 581 (citations omitted); Pagano v.

Frank, 983 F.2d 343, 348 (1st Cir. 1993). 

The movant must aver an "absence of evidence to support

the nonmoving party's case." The burden then shifts to the

nonmovant, the party opposing summary judgment, to establish the

existence of at least one fact issue which is both "genuine" and

"material." Maldonado-Denis, 23 F.3d at 581 (quoting Garside v.

Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (other citations

omitted)). A "genuine" issue is one that properly can be

resolved only by a finder of fact because it may reasonably be

resolved in favor of either party. Id. In other words, a

genuine issue exists "if there is 'sufficient evidence supporting

the claimed factual dispute' to require a choice between 'the

parties' differing versions of the truth at trial.'" Id.

(quoting Garside, 895 F.2d at 48). A "material" issue is one 

that might affect the outcome of the suit under the governing

law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

-9-

The nonmovant may not defeat a properly supported

motion for summary judgment by relying upon mere allegations or

evidence that is less than significantly probative. Id. at 249-

50. Rather, the nonmovant must present definite, competent

evidence to rebut the motion. Maldonado-Denis, 23 F.3d at 581.

B. Standing B. Standing

During oral argument, Appellees' counsel raised for the

first time in this case the issue of Appellants' standing to

bring their claims. Because standing is a jurisdictional

requirement which remains open to review at all stages of

litigation, National Org. for Women v. Scheidler, U.S. , 114

S. Ct. 798, 802 (1994), we ordered the parties to submit

supplemental briefs on the question.

If a plaintiff lacks standing to bring a matter before

a court, the court lacks jurisdiction to decide the merits of the

underlying case. United States v. AVX Corp., 962 F.2d 108, 113

(1st Cir. 1992). Thus, standing is a threshold issue,

determining whether the court has the power to hear the case, and

whether the putative plaintiff is entitled to have the court

decide the merits of the case. Id. The inquiry into a

plaintiff's standing "involves a blend of constitutional

requirements and prudential considerations." Valley Forge

Christian Coll. v. Americans United for Separation of Church and

State, 454 U.S. 464, 471 (1982). 

There are three irreducible, minimum constitutional

-10-

elements of standing. Lujan v. Defenders of Wildlife, U.S.

, 112 S. Ct. 2130, 2136 (1992). First, a plaintiff must have

suffered an "injury in fact" -- an invasion of a legally-

protected interest which is (a) concrete and particularized, and

(b) actual or imminent, not conjectural or hypothetical. Id.

(footnote and internal quotations omitted). Second, there must be

a causal connection between the injury and the conduct complained

of, such that the injury is fairly traceable to the challenged

action of the defendant and not the result of the independent

action of some third party not before the court. Id. Finally,

it must be likely, and not merely speculative, that the injury

will be redressed by a favorable decision. Id.

To establish these elements of standing at the summary

judgment stage of a proceeding, a plaintiff cannot rest on mere

allegations, but must set forth by affidavit or other evidence

specific facts which for purposes of the summary judgment motion

will be taken to be true. Id. at 2137. 

In addition to these constitutionally required

elements, the doctrine of standing also involves prudential

considerations. Specifically, a court must determine 1) whether

a plaintiff's complaint falls within the zone of interests

protected by the law invoked; 2) whether the plaintiff is

asserting its own rights and interests, and not those of third

parties;3 and 3) that the plaintiff is not asking the court to


3 An exception to this general rule is that associations may
assert the claims of their members in certain circumstances,
discussed below.

-11-

adjudicate abstract questions of wide public significance which

amount to generalized grievances more appropriately addressed by

the legislature. AVX Corp., 962 F.2d at 114 (citations omitted).

Finally, the Supreme Court has stated that a RICO

plaintiff seeking to invoke a court's jurisdiction must also

establish that she has been injured in her business or property

by the conduct allegedly constituting the RICO violation.

Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

With these principles in mind, we address whether the Appellants

have standing as to each claim.

1. Appellants' standing to bring a RICO claim  1. Appellants' standing to bring a RICO claim 

Appellees first contend that Appellants lack standing

to assert claims under 1962(c) and (d) of RICO. Specifically,

they argue that Libertad, Emancipaci n, and Grupo Pro Derechos

Reproductivos ("Grupo Pro Derechos") lack standing to bring a

RICO claim because they suffered no injury to business or

property. Second, Appellees argue that the three clinics and

Gonz lez, C ceres, and Castro lack standing under RICO because

they have failed to show that Appellees' actions proximately

caused them any injury.

a. Do Libertad and Emancipaci n have standing? a. Do Libertad and Emancipaci n have standing?

Libertad and Emancipaci n are women who have sought

reproductive health services at the blockaded clinics. Libertad

submitted a sworn statement in support of Appellants' opposition

to summary judgment, in which she described her experience at the

WMC. She stated that the anti-abortion protesters intimidated

-12-

her and made her angry; however, the protesters did not prevent

her from attending her appointment at the clinic and obtaining an

abortion.

Emancipaci n testified at the summary judgment hearing

about her experience at the blockaded clinic. Unlike Libertad,

Emancipaci n was intimidated enough by the Appellees' blockade

and protest tactics that she was deterred from entering the

clinic for her appointment. Emancipaci n eventually returned to

the clinic on a different day, however, and there is no

indication that the delay caused her any physical harm.

Although we acknowledge that both women reasonably felt

intimidated and harassed, neither woman suffered any injury to

business or property, as is required for standing to sue under

RICO. We therefore hold that Libertad and Emancipaci n do not

have standing to maintain this RICO claim.

b. Does the Grupo Pro Derechos have standing? b. Does the Grupo Pro Derechos have standing?

Appellant Grupo Pro Derechos is an association of

feminist and human rights organizations and individuals. The

group's mission is to defend women's reproductive rights, and to

work for quality women's health services, sex education, and

family planning. It allocates some of its resources to providing

protection for women who patronize a blockaded clinic, and sues

on its own behalf and on behalf of its members.

We have combed through the voluminous record and have

been unable to find any evidence, or even any specific

allegation, that the Grupo Pro Derechos has sustained any injury

-13-

to business or property as a result of Appellees' conduct. One

of the organization's members, Ms. Nancy Herzig Shannon,

testified that while at one of the blockaded clinics, she

received a death threat from a protester. She is not herself a

named plaintiff, however, and she did not testify about any

injury sustained by the group, such as expended resources,

property damage, foregone business activities, or extortionate

threats to its general membership. While the conduct of the

protesters, lawful and unlawful, certainly conflicts with the

group's mission and renders their objectives more difficult to

achieve, this by itself does not give rise to an injury to the

group's business or property interests. We therefore hold that

the Grupo Pro Derechos does not have standing to maintain this

RICO cause of action.4

c. Do the remaining Appellants have standing? c. Do the remaining Appellants have standing?

Appellees claim that the remaining Appellants, the

three clinics and their directors or administrators, lack

standing to bring the RICO claim because they have failed to show



4 Plaintiffs like Libertad and Emancipaci n could have standing
to sue under RICO, if they were to submit sufficient evidence of
injury to business or property such as lost wages or travel
expenses, actual physical harm, or specific property damage
sustained as a result of a RICO defendant's actions. The record
before us, however, does not sufficiently establish this required
element. Similarly, it is not impossible for unincorporated
groups and organizations to have standing under RICO, if the
group could meet the tests for associational or representational
standing, see, e.g., Pennell v. City of San Jos , 485 U.S. 1, 7
n.3 (1988), and could sufficiently establish that a RICO
defendant's conduct caused it some injury to business or
property.

-14-

that Appellees' acts proximately caused them injury.5 Even a

cursory review of the record, particularly of the testimony

adduced at the summary judgment hearing, belies this argument.

The record is replete with evidence of the extensive property

damage caused by Appellees' blockades at the clinics: broken


5 Appellees also claim that these Appellants lack standing
because they "lack" the necessary two predicate acts. As
Appellees point out, to prove a violation of RICO, a plaintiff or
plaintiffs must show a minimum of the two necessary "predicate
acts" which allegedly constitute a "pattern of racketeering
activity." See 18 U.S.C. 1961(5). Appellees contend that
because the record shows the WMC and LMC clinics were the targets
of only one blockade each, neither of them can sue under RICO.

This argument simply has no merit. An analysis of a
plaintiff's standing focuses not on the claim itself, but on the
party bringing the challenge; whether a plaintiff's complaint
could survive on its merits is irrelevant to the standing
inquiry. Family & Children's Ctr. v. School City of Mishawaka,
13 F.3d 1052, 1058 (7th Cir. 1994); see also Washington Legal
Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir.
1993) ("Our standing inquiry depends on whether the plaintiffs
have established the existence of a case or controversy . . . but
does not involve the merits of particular claims."). The "two-
act minimum" is a part of the substantive "pattern" element of a
RICO cause of action, not a threshold requirement necessary to
confer standing. See 18 U.S.C. 1961(5) and 1962; Fleet Credit
Corp. v. Sion, 893 F.2d 441, 444 (1990).

Moreover, nowhere in either the text of RICO or the case law
is there any suggestion that each victim of an alleged pattern of
racketeering activity must have suffered at least two predicate
acts at the hands of the defendant. In fact, adopting such a
requirement would conflict with the statute's purpose and
seriously curtail the statute's intended breadth. Under the
Appellees' proposed scheme, a defendant could avoid RICO
liability simply by continually choosing new targets for his
unlawful activities, a result that Congress could not have
intended. In the instant case, each Appellant clinic was the
target of Appellees' unlawful blockades. Each blockade was
executed in a similar fashion with exactly the same purpose -- to
delay or prevent the clinics from opening and providing
abortions. Therefore, that the LMC and WMC were only blockaded
once each is irrelevant to either their standing under RICO, or
to the merits of their claim. It is sufficient that the clinics
have been among the targets of Appellees' five blockades.

-15-

locks, damaged gates, vandalism, strewn litter on the grounds, to

list examples. Appellee Welch and his followers also did damage

inside the clinics, ripping out electrical sockets and jamming

door locks. The blockades also delayed or prevented the clinics

from conducting business on those days. We therefore find that

Appellants have sufficiently shown injury to business or

property, and that this injury was proximately caused by

Appellees.

As to the third, "redressibility" element of standing,

Appellants seek, among other things, declaratory and injunctive

relief from the Appellees' blockade activities -- the same

activities that caused their injury. This satisfies the

"necessary causal connection between the injury alleged and the

relief requested," Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 37

(1st Cir. 1993), and we therefore find that the remaining

Appellants have established the constitutional requirements

necessary to confer standing.

Over and above these constitutional requisites, an

analysis under the standing doctrine also embraces prudential

concerns regarding the proper exercise of the court's

jurisdiction. Vote Choice, Inc., 4 F.3d at 37. The remaining

Appellants satisfy these concerns. They are asserting their own

rights and interests in conducting their lawful business; their

grievances are particularized and concrete; and the Appellants

fall within the zone of interests contemplated by the explicit

terms of the RICO statute -- namely, "person[s] injured in

-16-

[their] business or property" by an alleged pattern of

racketeering activity. 1964(c); see also, Sedima, S.P.R.L., 473

U.S. at 483, 497 (discussing the "far-reaching civil enforcement

scheme" established by RICO, and rejecting restrictive readings

of the statute's intended scope).

Accordingly, we hold that the remaining Appellants --

the clinics, C ceres, Oficinas, Rivera, Gonz lez, and Castro --

all have standing to maintain this RICO claim.6

2. Appellants' standing to maintain a 1985(3) claim 2. Appellants' standing to maintain a 1985(3) claim

Appellees also contend that Appellants lack standing to



6 Appellees somewhat cryptically claim that Appellants have
failed to establish that their injuries were proximately caused
by the alleged underlying RICO violation, which in this case is
extortion under the Hobbs Act, 18 U.S.C. 1951(b)(2) (1984).
Under this provision, extortion means "the obtaining of property
from another, with his consent, induced by wrongful use of actual
or threatened force, violence, or fear." The intangible right to
freely conduct one's lawful business contitutes "property" for
purposes of this section. See Northeast Women's Ctr. v.
McMonagle, 868 F.2d 1342, 1350 (3d Cir.), cert. denied, 493 U.S.
901 (1989).

If Appellees are contending that Appellants have not
sufficiently proven the underlying extortion claim, this
contention again goes to the substantive merits of Appellants'
case, and not to the threshold issue of standing. Moreover, the
record clearly shows that Appellees used force (physical
obstruction, trespass, vandalism, resisting arrest),
intimidation, and harassment of clinic personnel and patients,
with the specific, uniform purpose of preventing the clinics from
conducting their normal, lawful activities. The record also
amply shows that Appellees' tactics include the intentional
infliction of property damage, and directly result in the
clinics' loss of business. It is difficult to conceive a set of
facts that more clearly sets forth extortion as it is defined by
1951(b)(2). We therefore are satisfied that, for the limited
purpose of maintaining their RICO claims, Appellants have
sufficiently established that Appellees' blockades constitute
extortion, and that the extortionate acts proximately caused
injury or damage to Appellants' property.

-17-

maintain their claim under the hindrance clause of 42 U.S.C.

1985(3).7 They argue that claims under the hindrance clause

require a showing of 1) a class-based, invidiously discriminatory

animus, and 2) the assertion of a right protected against both

private, as well as official, encroachment.8 As we will discuss

below, it is not entirely clear that Appellees' interpretation of

the hindrance clause's requirements is correct.

In any event, their interpretation is irrelevant to the

issue of Appellants' standing to maintain a 1985(3) hindrance

clause claim, because Appellees have once again confused the

substantive elements of a cause of action with the threshold

requirements necessary to confer standing. Appellants need not

establish the elements of their cause of action in order to sue,

only to succeed on the merits. In order to have standing to sue,

Appellants must only establish that the constitutional and

prudential considerations set forth above are satisfied.

It is clear that Appellants satisfy the requirements

for standing. First, for reasons similar to those set forth

above, the clinics, C ceres, Oficinas, Rivera, Gonz lez, and

Castro all have standing. They all have sufficiently established

an injury-in-fact, either to their physical plant, their


7 The hindrance clause of 1985(3) prohibits a conspiracy "for
the purpose of preventing or hindering the constituted
authorities . . . from giving or securing to all persons . . .
the equal protection of the law."

8 Appellees base their arguments on Bray v. Alexandria Women's
Health Clinic, U.S. , 113 S. Ct. 753 (1993), in which the
Supreme Court held that successful claims under the
"deprivation" clause of 1985(3) must establish these elements.

-18-

intangible property right to conduct lawful business, or both.

They have also sufficiently established that the Appellees'

activities proximately caused their injuries, and that the relief

they seek here will redress those injuries.

Although Libertad and Emancipaci n did not allege or

establish an injury to business or property sufficient to invoke

the court's jurisdiction on their RICO claim, they have

established an injury-in-fact sufficient to maintain their

1985(3) claim. The injury-in-fact requirement "serves to

distinguish a person with a direct stake in the outcome of a

litigation -- even though small -- from a person with a mere

interest in a problem." United States v. Students Challenging

Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 690 n.14

(1973) (citations omitted) (emphasis added). Therefore,

plaintiffs such as Libertad and Emancipaci n need not establish a

particularly damaging injury; they need only show that they were

directly affected by the conduct complained of, and therefore

have a personal stake in the suit. See also Adams v. Watson, 10

F.3d 915, 918 (1st Cir. 1993) (noting that the contours of the

injury-in-fact requirement are "generous," and that even a slight

injury suffices to confer standing). Both Libertad and

Emancipaci n had appointments at, and attempted to enter, one of

the blockaded clinics. Both were, therefore, targets of the

Appellees' activities which form the basis for the alleged

conspiracy in violation of 1985(3), and both were affected by

the alleged conspiracy to a degree sufficient to confer standing.

-19-

These Appellants also satisfy the prudential

considerations involved in the standing inquiry. First, their

claims do not fall outside the reasonable "zone of interests" of

1985(3), which purports to afford remedial relief to all

citizens. See Bray, U.S. at , 113 S. Ct. at 785 (Stevens,

J., dissenting) (discussing the statute's legislative history and

intended scope). Second, although the Appellants claim to bring

this suit in part on behalf of all women in Puerto Rico seeking

family planning services, they are also suing on their own behalf

and are therefore asserting their own concrete rights or

interests. Finally, their claims are not abstract questions or

generalized grievances, but instead are sufficiently

particularized, such that they may appropriately be addressed by

the judiciary. We therefore hold that Libertad, Emancipaci n,

the clinics, C ceres, Oficinas, Rivera, Gonz lez, and Castro all

have standing to maintain their claim under the hindrance clause

of 1985(3).

The Grupo Pro Derechos is the only Appellant whose

standing under 1985(3) is still in question. Because Grupo Pro

Derechos is an association whose standing is premised not on

injury to itself but to others, we apply the test for

"associational standing," which is slightly different than the

traditional standing inquiry. It is well settled that an

association may sue on behalf of its members when 1) at least one

of its members possesses standing to sue in his or her own right;

-20-

2) the interests that the suit seeks to vindicate are pertinent

to the objectives for which the organization was formed; and 3)

neither the claim asserted nor the relief demanded necessitates

the personal participation of affected individuals. AVX Corp.,

962 F.2d at 116 (citations omitted).

That Grupo Pro Derechos satisfies the second and third

prongs of this analysis is not reasonably subject to debate. The

interests of its suit here -- to prevent unlawful blockade

activities at abortion clinics in Puerto Rico in order to ensure

access to family planning services for Puerto Rican women -- is

not only pertinent to the group's purpose, it is its primary

purpose. Nor do the group's claims here require that each of its

members participate in the suit or in the relief demanded.

The only real issue is whether the Grupo Pro Derechos

satisfies the first prong -- that is, whether at least one of its

members has standing to assert the claims in his or her own

right. In the Appellants' amended complaint, the group is

described as an association of feminist and human rights

organizations and individuals. Among its members is Nancy Herzig

Shannon, who testified that she was harassed during one of the

blockades, and received a death threat from a protester. This is

certainly enough to confer standing on her. Because it is not

contested that Herzig is a member of Grupo Pro Derechos and she

has standing on her own to sue, we hold that the Grupo Pro

Derechos has associational standing to maintain the 1985(3)

claim.

-21-

C. Appellees' claims of defective service of process C. Appellees' claims of defective service of process

Appellants contend that the district court erroneously

dismissed their claims against SLC and Rescue America due to

defective service of process. Specifically, the court found that

the service was defective because the summons failed to state the

name of the person served. The court's dismissal, claim the

Appellants, was based on its incorrect assumption that Appellants

had conceded the issue of improper service, and was granted sua

sponte without affording them an opportunity to defend the

service.

In fact, claim the Appellants, all the defendants,

including SLC and Rescue America, were personally served by U.S.

Marshals, and return of service was filed with the district

court. Rescue America and SLC were both served through a proper

agent as authorized by Fed. R. Civ. P. 4(h). For Rescue America,

the U.S. Marshals served both Treshman, the group's National

Director, and Martin, the group's Executive Director. For SLC,

the Marshals served Weslin, the group's national director.

We have held that "the root purpose underlying service

of process is to ensure that a defendant receives fair notice of

the suit and adequate opportunity to protect her interests."

Jardines Bacata, Ltd. v. D az-M rquez, 878 F.2d 1555, 1559 (1st

Cir. 1989). When an alleged defect in service is due to a minor,

technical error, only actual prejudice to the defendant or

evidence of a flagrant disregard of the requirements of the rules

justifies dismissal. 4A C. Wright and A. Miller, Federal

-22-

Practice & Procedure, Civ. 2d 1088; Benjamin v. Grosnick, 999

F.2d 590, 594 (1st Cir. 1993) (dismissal for defective service

not required where defect in service did not prejudice

defendant); see also, Hobson v. Wilson, 737 F.2d 1 (D.C. Cir.

1984) (dismissal for defective service should be granted only

when defendant was prejudiced); United Food & Comm'l Workers

Union Int'l v. Alpha Beta Co., 736 F.2d 1371, 1382 (9th Cir.

1984) (dismissal is generally not justified absent a showing of

prejudice, and defendant's answer and general appearance in

action should prevent any technical error from invalidating

entire process).

Here, Appellees do not claim that they suffered any

prejudice from the minor, technical defect in the summonses, and

we do not discern any prejudice. It is clear that at all times

during the proceedings, Rescue America and SLC had fair notice of

the suit, and adequate opportunity to protect their interests.

Both parties' counsel made general appearances at every stage of

the proceeding, and had ample opportunity to defend against the

Appellants' claims. Dismissing the claims against Rescue America

and SLC exalts the form of Rule 4 over its substance and purpose.

We therefore find that the district court improperly dismissed

the Appellants' claims against Rescue America and SLC on these

grounds, and we accordingly reinstate the claims against these

Appellees. We may now turn to the substance of Appellants'

claims.

III. ANALYSIS III. ANALYSIS

-23-

A. Appellants' RICO claims A. Appellants' RICO claims

Appellants allege that Appellees have conspired to, and

have conducted or participated in the conduct of an enterprise

through a pattern of racketeering activities, specifically with

intent to extort Appellants' property interest in their business

and practice of health care, all in violation of 1962(c) and

(d) of RICO.9

To state a claim under 1962(c), a plaintiff must

allege each of the four elements required by the statute: 1)

conduct; 2) of an enterprise; 3) through a pattern; 4) of

racketeering activity. Feinstein v. Resolution Trust Corp., 942

F.2d 34, 41 (1st Cir. 1991) (citing Sedima, S.P.R.L., 473 U.S. at

496). For claims under 1962(d), a plaintiff must show that

each defendant in the RICO conspiracy case joined knowingly in

the scheme and was involved himself, directly or indirectly, in

the commission of at least two predicate acts. Feinstein, 942

F.2d at 41 (citations omitted); see also United States v.

Angiulo, 847 F.2d 956, 964 (1st Cir.) (necessary elements of RICO

conspiracy charge are 1) existence of enterprise; 2) that each

defendant knowingly joined the enterprise; and 3) that each

defendant agreed to commit, or in fact committed, two or more

predicate acts as part of his participation in enterprise), cert.


9 Section 1962(c) of RICO makes it unlawful "for any person
employed by or associated with any enterprise engaged in, or the
activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of
such enterprise's affairs through a pattern of racketeering
activity . . . ." Section 1962(d) makes it unlawful for any
person to conspire to violate 1962(c).

-24-

denied, 488 U.S. 852 (1988).

1. Have Appellants established an "enterprise"? 1. Have Appellants established an "enterprise"?

The term "enterprise" is defined in the RICO statute as

including "any individual, partnership, corporation, association,

or other legal entity, and any union or group of individuals

associated in fact although not a legal entity." 1961(4)

(emphasis added). There are, therefore, two types of

enterprises: legal entities and associations-in-fact. United

States v. Turkette, 452 U.S. 576, 580-581 (1981). The Supreme

Court has explained that in order to prove a RICO claim, a

plaintiff must show both an "enterprise" and a "pattern of

racketeering activity." Turkette, 452 U.S. at 583. The

enterprise is an entity, a group of persons associated for a

common purpose of engaging in a course of conduct. The pattern

of racketeering activity, on the other hand, is a series of

criminal acts as defined by the RICO statute. The former is

proved by "evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as

a continuing unit." Id. The latter is proved by "evidence of

the requisite number of acts of racketeering committed by the

participants in the enterprise." Id. While the proof used to

establish these separate elements may "coalesce," proof of one

does not necessarily establish the other. Id. The "enterprise"

is not the "pattern of racketeering activity;" it is an entity

apart and distinct from the pattern of activity in which it

engages. The existence of an enterprise is, therefore, a

-25-

separate element which must be proven. Id.

The enterprise need not be a profit-seeking entity, or

a victim of unlawful activities. Scheidler, 114 S. Ct. at 804.

Rather, the enterprise may be the "vehicle" through which the

unlawful pattern of racketeering activity is committed. Id. 

In addition, we have consistently held that the same

entity cannot do "double duty" as both the RICO defendant and the

RICO enterprise. See, e.g., Miranda v. Ponce Federal Bank, 948

F.2d 41, 44-45 (1st Cir. 1991) (citations omitted). The person

or persons alleged to be engaged in racketeering activity must be

entities distinct from the enterprise. Odishelidze v. Aetna Life

& Casualty Co., 853 F.2d 21, 23 (1st Cir. 1988) (per curiam). In

other words, because the racketeer and the enterprise must be

distinct, Miranda, 948 F.2d at 45, the enterprise must be an

entity separate from the named defendants who are allegedly

engaging in unlawful activity.

The district court granted summary judgment against

Appellants, finding that they had failed to show the existence of

an "enterprise." Relying on Turkette, the court held that

Appellants had adduced no evidence that the Appellees formed an

association-in-fact or that they functioned as a continuing unit.

The district court reasoned that the record shows only that the

Appellees came together for one "ephemeral gathering," the clinic

blockade in Puerto Rico on January 8; it does not, the court

continued, indicate that this activity emanated from an

association distinct from the activities themselves. Appellants

-26-

now contend that the district court erred in granting summary

judgment on these grounds.

Appellants have offered evidence regarding the

structure, organization, and various activities of the Appellees

Rescue America, SLC, and PLRT, and claim that it establishes that

each of these groups is an "association-in-fact" enterprise.

This argument, however, misses the point of our holdings in

Miranda, 948 F.2d at 44-45 and the cases cited therein. To

support the Appellants' RICO claim, the record must contain

evidence that the Appellees -- Rescue America, SLC, PLRT, and the

individuals -- constitute and operate as part of an association-

in-fact enterprise. In other words, Appellants must show the

existence of the enterprise, of which the Appellees were a part.

As a matter of law, it is not sufficient that several organized,

ongoing groups come together for one concerted action, unless

those groups can also be shown to constitute a larger unit, over

and above their separate structures and operations,10 and that

this unit meets the Turkette criteria for an "association-in-

fact."

We disagree with the district court's characterization

of the January 8 blockade as an "ephemeral gathering"; despite

Appellees' protestations to the contrary, it is clear that a



10 This is not to say that the separate structures and distinct
activities of each Appellee are irrelevant. Evidence of
structure, organization, or operations could indicate that the
groups' regular course of conduct involves their functioning as
part of a larger enterprise. It is not, however, sufficient in
itself to show the existence of the enterprise.

-27-

substantial amount of planning and coordination occurred among

the Appellees in preparation for the January 8 incident.11

This evidence alone, however, is insufficient to show an

enterprise. There are five clinic blockades at issue here; at

only the January 8 protest, however, were all of the Appellees

present or represented. The record shows that the other four

protests were organized and conducted solely by Appellee Welch,

members of the PLRT, and on one occasion, Carlos S nchez.

Evidence of the one blockade's coordination therefore does not

lead ineluctably to a conclusion that the Appellees belong to or

constitute an ongoing organization that functions as a continuing

unit.

Appellants contend that under the generous standard of

review for summary judgment, this one well-planned blockade could

indicate the existence of an enterprise, and that summary

judgment was therefore improperly granted. We have repeatedly

held, however, that mere conjecture does not suffice to create a

factual dispute and overcome a summary judgment motion. Thomas

v. Metropolitan Life Ins. Co, 40 F.3d 505, 508 (1st Cir. 1994)

(citations omitted). While the January 8 blockade "could" be

just the tip of the alleged enterprise's iceberg, this

speculation can not defeat summary judgment. Without more, one

could just as reasonably speculate that the January 8 blockade


11 These planning efforts include the financing and arranging of
Treshman and Martin's travel to Puerto Rico, drafting and
issuance of press releases, preparation of banners, placards, and
flyers, and the coordination of meetings, press conferences and
the blockades themselves.

-28-

was a well-coordinated but one-time activity of several similar

but otherwise unconnected parties, and not an act by members of

an ongoing organization.

The Appellants also argue that because there were

numerous blockades, all using the same methods and involving

similar groups and individuals, and all for the purpose of

preventing abortions, it follows that an enterprise exists.

Certainly, these Appellee organizations and individuals have

similar objectives, and use similar methods of attaining those

goals -- some lawful or even constitutionally protected, some

not. Yet similarity of goals and methods does not suffice to

show that an enterprise exists; what is necessary is evidence of

systemic linkage, such as overlapping leadership, structural or

financial ties, or continuing coordination.

Furthermore, we are mindful of the Supreme Court's

admonition in NAACP v. Claiborne Hardware Co., 458 U.S. 866, 930-

932 (1982), that liability for mere membership in an association,

particularly when that association is ideological, may conflict

with the First Amendment. See also Scheidler, 114 S. Ct. at 807

(Souter, J., concurring) (discussing possible First Amendment

issues raised by RICO actions against protest groups). In light

of these constitutional concerns, it is particularly important

that Appellants present sufficient evidence, beyond the

Appellees' similarity of viewpoint, rhetoric and strategy, to

show an enterprise.

To this effect, Appellants have submitted a press

-29-

release12 written in Spanish and issued by Rescue America in

Houston, dated March 4, 1994 (one year after the blockades), the

certified translation of which reads in pertinent part:

Don Treshman, the controversial national
director of the anti-abortion group
Rescue America, announced today in
Houston a campaign to stop all abortions
in Puerto Rico. Treshman stated that
worldwide Puerto Rico is already
considered a pro-life success because of
the actions taken by a local affiliated
group, the Pro-Life Rescue Team. 'The
time is coming to finish what we have
started,' said Treshman. At the same
time, Treshman announced that Father
Patrick Welch will arrive in Puerto Rico
tomorrow . . . . Father Welch was
arrested together with Treshman last year
as a result of a blockade in front of an
abortion clinic in San Juan . . . .
'Father Welch is representing Rescue
America as the regional director' . . .
Rescue America is well known for its
creative tactics used to block abortion
clinics in all parts of the United States
and in other countries. Treshman said
that it is 'very probable' that an anti-
abortionist group from the United States
may come to Puerto Rico within a short
time, for the second time 'to participate
with local pro-life groups.' He refused
to indicate whether the radical group is
planning to block access to some of the
abortion facilities . . . , but he said
that 'they will use all the methods that
they believe necessary to save the lives
of the innocent unborn.' Father Welch


12 We reject Appellees' contention that the press release is
inadmissible hearsay. The press release is not hearsay, but
admissible evidence as an admission of a party-opponent under
Fed. R. Evid. 801(d)(2)(A).

Appellants also point to statements allegedly made by Welch
and reported in a local newspaper as supporting the existence of
an enterprise. These newspaper articles, unlike the press
release, are hearsay, and thus inadmissible to prove the truth of
the matters asserted therein.

-30-

will supposedly give more details during
a press conference today . . . .

(Emphasis added). Additionally, although Appellee Welch denied

that the PLRT was affiliated with any other organization, he

stated that he "shared information" with other groups, including

Rescue America, on a regular basis, by faxing and mailing

tactical manuals, videos, pamphlets, press releases, and activity

updates to one another.

These facts, viewed in the light most favorable to the

Appellants, strongly suggest that the Appellees Rescue America,

PLRT, Welch, and Treshman constitute or are part of an

"association-in-fact." Rescue America's press release claiming,

if not boasting of, its "affiliation" with the PLRT, and naming

Welch as a "regional director," is highly competent evidence that

the two groups are connected in a somewhat formal sense, and that

they share common leaders or organizers -- in other words, that

they function as a continuing unit. That the press release

announced the groups' plans to "continue" their efforts in Puerto

Rico, over a year after the blockades, also indicates a ongoing

relationship among those Appellees. We therefore find that the

Appellants have adduced sufficient evidence of an "enterprise"

among Rescue America, Welch, Treshman, and the PLRT to defeat

summary judgment, and we reverse the district court's ruling as

to the existence of an enterprise.

Appellants have not, however, pointed to any competent

evidence that the Appellees Weslin, Martin, or the SLC have been

or are associated with any of the other Appellees on an ongoing

-31-

basis, or that they function with them as part of a continuing

unit. In fact, the record shows nothing more than that those

Appellees planned and participated in one blockade with the

others. Furthermore, although Welch testified that he

communicates with Appellee S nchez as often as every other day

about their groups' activities, he denied that they ever

discussed blockades, and we find no evidence in the record to

indicate otherwise, or suggesting that S nchez is associated with

the PLRT or Welch. We therefore find that the Appellants have

not adduced sufficient evidence that Weslin, Martin, S nchez, and

the SLC are part of any RICO enterprise, and affirm the district

court's dismissal of Appellants' RICO claims as to those

Appellees only.

2. Have Appellants established a "pattern of 2. Have Appellants established a "pattern of
racketeering activity"? racketeering activity"?

Under the terms of the RICO statute, a "pattern of

racketeering activity requires at least two acts of racketeering

activity." 18 U.S.C. 1961(5). The definitional section "does

not so much define a pattern of racketeering activity as state a

minimum necessary condition for the existence of such a pattern."

H.J. Inc., 492 U.S. at 237. The two predicate acts of

racketeering activity must be acts chargeable or indictable under

any one or more of certain specified criminal laws. Feinstein,

942 F.2d at 42; 18 U.S.C. 1961(1)(B). These acts include

-32-

"extortion" as it is defined in the Hobbs Act, 18 U.S.C.

1951(b)(2).13 In addition, a RICO plaintiff must demonstrate

that the predicate acts are related, and that they amount to or

pose a threat of continued criminal activity. H.J. Inc., 492

U.S. at 237.

a. Relatedness a. Relatedness

We have noted that "the relatedness test is not a

cumbersome one for a RICO plaintiff." Feinstein, 942 F.2d at 44.

A RICO plaintiff establishes that predicate acts are related by

demonstrating that they "have the same or similar purposes,

results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and

are not isolated events." H.J. Inc., 492 U.S. at 241; see also

Fleet Credit Corp., 893 F.2d at 445. A fact-specific allegation

of a single common scheme can be used to satisfy the relatedness

requirement. Feinstein, 942 F.2d at 44. As the district court

succinctly and correctly noted, there is little doubt in this

case that the alleged predicate acts are related.

Appellees state, however, that the "relatedness"

requirement is not met as to Treshman and Rescue America, as the

record does not reflect that they engaged in more than one

predicate act. This bare assertion seems to rest on the faulty



13 As we explained above, this provision defines extortion as
"the obtaining of property from another, with his consent,
induced by wrongful use of actual or threatened force, violence,
or fear." The intangible right to freely conduct one's lawful
business contitutes "property" for purposes of this section.
Northeast Women's Ctr., 868 F.2d at 1350.

-33-

premise that each blockade constitutes only one predicate act.

Appellees ignore the possibility that more than one predicate act

-- that is, more than one act that constitutes extortionate

activity -- may have been committed at each blockade, including

the January 8 blockade in which Rescue America and Treshman

participated. For example, several instances of vandalism,

harassment, and verbal threats occurred at the one blockade at

which Treshman and Rescue America were present; each instance is

arguably an extortionate, predicate act.

Furthermore, the physical presence of all the Appellees

in Puerto Rico is not necessarily required for the acts to be

related, particularly for the Appellants' conspiracy claim. We

have held that "a RICO conspiracy [under 1962(d)] does not

demand total fusion or that all defendants participate in all

racketeering acts, know of the entire conspiratorial sweep, or be

acquainted with all other defendants." United States v. Boylan,

et al., 898 F.2d 230, 242 (1st Cir.), cert. denied, 498 U.S. 849

(1990). The plaintiff need only show that the component parts of

a conspiracy were linked together in such a way as to afford a

plausible basis for the inference that an agreement existed. Id.

A RICO conspiracy claim under 1962(d) thus covers direct and

indirect participation in a predicate act, including preparation,

planning, and direction. We therefore affirm the district

court's ruling that the Appellants have established that the

predicate acts are related.

b. Continuity b. Continuity

-34-

In order to establish the continuity of the predicate

acts, a plaintiff must show either 1) that the acts amount to

continued criminal activity, in that the related acts extend over

a period of time; or 2) that the predicate acts, though not

continuous, pose a threat of continued activity. H.J. Inc., 492

U.S. at 242; Fleet Credit Corp., 893 F.2d at 446. Because RICO

was intended by Congress to apply only to enduring criminal

conduct, predicate acts extending over a few weeks or months do

not generally satisfy this requirement. Feinstein, 942 F.2d at

45. Under the second, "threat" approach, however, even where the

predicate acts occur in a narrow time frame, the requirement can

still be satisfied by demonstrating "a realistic prospect of

continuity over an open-ended period yet to come." Id. This

approach "necessitates a showing that 'the acts themselves

include a specific threat of repetition extending indefinitely

into the future, [or] . . . are part of an ongoing entity's

regular way of doing business.'" Id. (quoting H.J. Inc., 492

U.S. at 242).

Under the first method of establishing continuity, the

district court found, we think correctly, that the five blockades

over a three-month period did not constitute a closed-end period

of continued criminal conduct. Appellants do not specifically

contest this finding here. Rather, they challenge the district

court's finding that the record does not reveal "a realistic

prospect that the activity challenged in this suit will resume

with enduring effects," and that therefore, no continuity was

-35-

established.

Appellants point out that the predicate acts involved

in this case -- the blockades, vandalism, and the threatening

harassment of clinic personnel and patients -- are part of the

regular way that the defendants conduct their ongoing activities.

The entire purpose of Rescue America, the PLRT, and their

leaders, contend the Appellants, is preventing abortions, and

they do this by regularly using unlawful as well as lawful

tactics. Appellants further argue, and the record shows, that

part of the Appellees' strategy is to strike randomly with little

or no warning of which clinic they will target, making it

inherently difficult or impossible to determine whether and when

they will blockade again. There is also evidence that Rescue

America has been conducting protests and blockades for several

years, and shows no signs of abating or changing its unlawful

tactics. Indeed, the March 4, 1994 press release, quoted in

relevant part above, strongly indicates that the Appellees plan

to continue their activities in Puerto Rico, lawful and unlawful.

Appellees contend that there is nothing about the

challenged conduct that by its nature projects into the future

with a threat of repetition. The January 8, 1993 blockade, they

claim, was a "special gathering," an event unlikely to be

repeated. They point out that Treshman left Puerto Rico after

the blockade and has "no immediate plans to return." It is not

the nature of the conduct itself, however, that suggests a threat

-36-

of continuing; it is the fact that the Appellees' regular way of

conducting their affairs involves the illegal acts conducted at

that blockade, and that the Appellees have admitted that they

plan to "continue their efforts." Moreover, Treshman's physical

presence in Puerto Rico is not necessary for Appellees to plan or

threaten future unlawful blockade activities in furtherance of

the alleged conspiracy. We therefore find that sufficient

evidence in the record raises a genuine issue of material fact as

to whether the Appellees' conduct posed a threat of continuing

activity, and that the district court thus erred in granting

summary judgment against the Appellants on this basis.

Accordingly, we remand the Appellants' RICO claims

against Appellees Welch, Treshman, Rescue America, and the PLRT

only, for further proceedings to determine whether Appellants can

prove the elements of their RICO causes of action.

B. The Appellants' Section 1985(3) claims B. The Appellants' Section 1985(3) claims

The Appellants also claim that Appellees' actions

violate the second clause of 42 U.S.C. 1985(3).14 The


14 Section 1985(3) provides:

If two or more persons . . . conspire
. . . for the purpose of depriving,
either directly or indirectly, any person
or class of persons of the equal
protection of the laws, or of equal
privileges and immunities under the laws;
or for the purpose of preventing or
hindering the constituted authorities . .
. from giving or securing to all persons
. . . the equal protection of the laws .
. . the party so injured or deprived may
have an action for the recovery of
damages . . . against one or more of the

-37-

district court granted summary judgment for the Appellees on this

claim, holding that the Appellants had not adduced any evidence

that Appellees' purpose or intent was to hinder law enforcement

authorities from securing for women their right to seek

abortions. The court reasoned that because the purpose of the

Appellees' activities was "to 'stop the killing of babies,'" or

prevent abortions, "and not ultimately to impede law

enforcement," the Appellants had not met their burden.

We think that the district court's reasoning on this

point misses the trees for the forest. It is akin to saying that

a bank robber lacks mens rea and thus cannot be convicted because

his ultimate objective was to make money, not to commit robbery.

While it is indisputable that the broader objective behind all of

the Appellees' actions is the prevention of abortions, the

properly framed issue is whether, in effectuating that goal,

Appellees purposefully employed tactics designed to prevent the

authorities from securing equal protection of the laws to

Appellants. In order to address this issue, however, we must

first analyze just what constitutes such a violation; put another

way, we must determine what a plaintiff must establish in order

to maintain a claim under 1985(3)'s hindrance clause.

We embark on this analysis with relatively little

guidance. Although the Supreme Court has interpreted the first



conspirators.

(Emphasis added). Only the second clause, called the "hindrance
clause," is relevant to the instant case.

-38-

clause, called the "deprivation clause," of 1985(3), it has

never construed the hindrance clause, and in fact, has expressly

left this question open. Bray, 113 S. Ct. at 764-66. To further

complicate matters, several Justices of the Bray Court offered

conflicting views, in dicta, on the interpretation of the

hindrance clause. Nevertheless, the Court's 1985(3)

jurisprudence is instructive here, and is therefore a logical

starting point for our analysis.

The Supreme Court has held that in order to prove a

private conspiracy under the deprivation clause of 1985(3), a

plaintiff must show 1) that some racial, or perhaps otherwise

class-based, invidiously discriminatory animus lay behind the

conspirators' actions, and 2) that the conspiracy is aimed at

interfering with rights that are protected against private, as

well as official, encroachment.15 Bray, 113 S. Ct. at 758

(citing Griffin v. Breckenridge, 403 U.S. 88, 102 (1971);

Carpenters v. Scott, 463 U.S. 825, 833 (1983)). These

requirements are necessary to limit the clause to its intended,

constitutional purpose and prevent its use as a "general federal

tort law." Griffin, 403 U.S. at 102. 

Applying its deprivation clause precedents to the

context of abortion clinic blockades, the Court held in Bray that

the phrase "otherwise class-based, invidiously discriminatory



15 Thus far the Supreme Court has recognized two such rights for
deprivation clause purposes: the Thirteenth Amendment right to
be free from involuntary servitude, and the right of interstate
travel. Bray, 113 S. Ct. at 764.

-39-

animus" could not apply to "women seeking abortions" because they

were not a protected class. Bray, 113 S. Ct. at 759. The Court

further held that the record of that case did not indicate that

the protesters were motivated by a purpose directed at women in

general, but rather at stopping abortions. Id. at 759-60. The

Court did not specifically rule on whether women in general could

ever be a protected class; it did state that the "animus"

requirement could be met not only by "maliciously motivated"

discrimination against women, but by "assertedly benign (though

objectively invidious)" discrimination as well. Id. at 759. The

Court explained that such assertedly benign discrimination would

demand, however, "at least a purpose that focuses on women by

reason of their sex -- for example (to use an illustration of

assertedly benign discrimination), the purpose of 'saving' women

because they are women from a combative, aggressive profession

such as the practice of law." Id. The Court further held that

because abortion was a right protected against official, but not

private, encroachment, the Bray plaintiffs could not maintain

their cause of action under the deprivation clause. Id. at

762.16

The Bray majority (consisting of Justices Scalia,

White, Kennedy, and Thomas and Chief Justice Rehnquist) refused

to consider any hindrance clause claim, stating that such a claim



16 The Bray majority also rejected the plaintiffs' claim that
the protesters' activities deprived them of their right to
interstate travel, holding that impairment of the protected right
must be "a conscious objective" of the conspirators. Id. at 762.

-40-

was not properly before the Court. Id. at 764-65. In explaining

its refusal to interpret the hindrance clause, however, the Bray

majority stated in dictum that a cause of action under the

hindrance clause "would seem to require the same 'class-based,

invidiously discriminatory animus' that the 'deprivation' clause

requires." Id. at 765. The majority reasoned that the source of

the animus requirement is the statute's language requiring intent

to deprive of "equal protection" or "equal privileges and

immunities," and that such language appears in the hindrance

clause as well. To hold otherwise, the majority explained, would

require construing the phrase "equal protection" differently in

two clauses of the same statute, contrary to basic principles of

statutory construction. Id. at 765-66 (citing Griffin, 403 U.S.

at 102). The Bray majority also roundly criticized the dissents'

arguments that the deprivation clause's second requirement --

that the right be protected against private, as well as official,

encroachment -- would not necessarily apply to the hindrance

clause as well. Id. at 766-67. 

The four dissenting Justices responded that the plain

language of 1985(3) does not require the same restrictions on a

hindrance clause cause of action. Justice Souter contended that

neither restriction would apply to the hindrance clause. Id. at

776-77 (Souter, J., dissenting). Justices Stevens and Blackmun

argued that a class-based animus was required under the hindrance

clause, but that it can be inferred if the conspirators' conduct

burdens activities that are performed exclusively by members of a

-41-

protected class, such as women. Id. at 787 (Stevens, J.,

dissenting). Justice O'Connor, joined by Justice Blackmun,

contended that class-based animus is required. She went on to

argue that women are a protected class, and that class-based

discrimination is met whenever the motivation of the conspirators

is directly related to the characteristics of that class, such as

the ability to become pregnant or to terminate pregnancy. Id. at

801 (O'Connor, J., dissenting). Further, Justice O'Connor

argued, the hindrance clause does not require that the

constitutional right be one protected against private

encroachment. Id. at 803 (O'Connor, J., dissenting).

Only one court has interpreted the requirements of the

hindrance clause in the rather muddy wake left by Bray. In

National Abortions Fed'n v. Operation Rescue, 8 F.3d 680 (9th

Cir. 1993), the Ninth Circuit examined the varying opinions of

the Bray justices in light of the language of the statute itself,

and decided that the hindrance clause provides a cause of action

only where the purposeful hindering of the police was directed at

a protected class exercising a constitutional right. National

Abortions Fed'n, 8 F.3d at 685. It would be considered "directed

at the class" if the activity is one exclusively engaged in by

that class. Id. The court therefore held that "a conspiracy to

prevent or hinder state law enforcement officers from securing

the constitutional rights to an abortion for women, a class

exclusively seeking to exercise that right, is actionable under

the hindrance clause." Id. at 687. Not surprisingly, the

-42-

Appellants urge us that National Abortions Fed'n is persuasive

and applicable here, whereas Appellees contend that the Ninth

Circuit's reasoning is unsound and the facts entirely

distinguishable from those at bar.

Although we find the court's reasoning in National

Abortions Fed'n helpful, we cannot follow it blindly. Instead,

we must perform our own analysis, guided by the statute's

language and the cases discussed, to determine 1) whether a claim

under the hindrance clause requires some class-based, invidiously

discriminatory animus; 2) if so, whether women are such a class;

3) if so, whether Appellants have sufficiently shown that

Appellees possess such animus; and 4) whether the hindrance

clause encompasses rights protected against official, but not

private, encroachment.

1. Does the hindrance clause require "animus"? 1. Does the hindrance clause require "animus"?

The source of the "animus" requirement for claims under

the deprivation clause is the statute's language "requiring

intent to deprive of equal protection, or equal privileges and

immunities." Griffin, 403 U.S. at 102 (emphasis in original).

By requiring such a class-based animus, the Griffin Court was

attempting to give full effect to the statute's purpose without

creating a "general federal tort law." Id. at 101-102. In Bray,

the Court, albeit in dictum, stated clearly that this requirement

should also apply to the hindrance clause, lest the same phrase -

- "equal protection" -- be construed differently in the same

statute.

-43-

We are persuaded by this common sense argument, and

Appellants have offered no alternative contentions for our

consideration on this issue.17 We therefore hold that a

plaintiff under the hindrance clause of 1985(3) must show that

the alleged conspiracy was motivated by some class-based,

invidiously discriminatory animus.

2. Are women a protected class? 2. Are women a protected class?

Although it did not expressly answer this question, the

Bray majority did concede that women may be a protected class for

1985(3) purposes, and based much of its reasoning on this

possibility. Bray, 113 S. Ct. at 759. Certainly, nothing in the

statute or its legislative history precludes such a result. The

legislative history of 1985(3) confirms that even though it was

primarily motivated by the mob violence directed at the newly

emancipated slaves in the Reconstruction era, "its protection

extended to 'all the thirty-eight millions of the citizens of

this nation.'" Bray, 113 S. Ct. at 785 (Stevens, J., dissenting)

(quoting Cong. Globe, 42d Cong., 1st Sess., 484 (1871)).

Moreover, it is logical that, at the very least, the classes

protected by 1985(3) must encompass those classifications that

merit heightened scrutiny under Equal Protection Clause analysis,

of which gender is one. See id. at 801 (O'Connor, J.,

dissenting).

Perhaps not surprisingly, then, several other circuits


17 Appellants merely state that we "need not" rule on whether
such an animus is required, because they have adduced sufficient
evidence that Appellees have demonstrated such animus.

-44-

addressing this question have all concluded that women fall

within the statute's protection. See, e.g., National Org. for

Women v. Operation Rescue, 914 F.2d 582, 585 (4th Cir. 1990); New

York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1359 (2d

Cir. 1989), cert. denied, 495 U.S. 947 (1990); Volk v. Coler, 845

F.2d 1422, 1434 (7th Cir. 1988); Novotny v. Great Am. Fed. Sav. &

Loan Ass'n, 584 F.2d 1235, 1244 (3d Cir. 1978) (en banc), vacated

on other grounds, 442 U.S. 366 (1979).

Accordingly, we hold that women are a protected class

falling within the ambit of the protections afforded by

1985(3).

3. Have Appellants shown that Appellees possess an 3. Have Appellants shown that Appellees possess an
invidiously discriminatory animus against women? invidiously discriminatory animus against women?

The Appellants contend that they have adduced ample

evidence that the Appellees are motivated in their actions by a

maliciously motivated animus against women in general. They

point out that the protesters who blockade the clinics scream

discriminatory epithets to women attempting to enter, such as

"lesbians, killers . . . lesbians can't have babies." Appellee

Weslin testified as to his belief that many women who are pro-

choice are "lesbians," "drug addicts" who "barbecue babies" in

front of the clinics, "satan worshippers," and "people who

surround baby killers."

Appellants also contend that Welch and Weslin have both

amply demonstrated an assertedly benign but objectively

discriminatory animus towards women. They point to testimony of

both Welch and Weslin that most women are ignorant about

-45-

abortion, and that they believe they must inform women of the

"true" facts about abortion in order to "save" the women from

being "victimized" by friends, family and society. Welch

testified that the women seeking abortions at the clinics are so

"grossly ignorant" that they are not "culpable" for "murdering"

their babies, and that it is his job to "protect" women from

their own decisions to have abortions.

Appellees argue that these remarks are intended to

"empower" women, and that Appellants mischaracterize them in

labelling them as paternalistic and patronizing. Appellees'

strenuous contentions to this effect are wholly conclusory,

however, and therefore cannot serve as the basis for a judgment

as a matter of law. The Appellants have pointed to a great deal

of testimonial evidence that at the very least raises a genuine

dispute as to whether the Appellees possess discriminatory animus

towards women, and this issue is material to the outcome of their

1985(3) claim. We therefore find that the district court erred

in granting summary judgment on these claims, and remand for

further proceedings to determine whether Appellees possess a

discriminatory animus, either overtly malicious or assertedly

benign, against women in general. Unless such animus can be

established, Appellants' hindrance clause claims must be

dismissed.

4. Does the hindrance clause encompasses rights 4. Does the hindrance clause encompasses rights
protected only against official, but not private, protected only against official, but not private,
encroachment? encroachment?

Section 1985(3) does not "'provide[] any substantive

-46-

rights itself' to a class conspired against." Carpenters, 463

U.S. at 833 (quoting Great Am. Fed'l Sav. & Loan Ass'n v.

Novotny, 442 U.S. 366, 372 (1979)). The rights, privileges, and

immunities that 1985(3) vindicates must therefore be found

elsewhere, presumably in the Constitution. Id. In Carpenters,

the Court examined 1985(3) in its entirety and concluded that a

conspiracy to infringe First Amendment rights (protected only

against official, but not private, encroachment) "is not a

violation of 1985(3) unless it is proved that the State is

involved in the conspiracy or that the aim of the conspiracy is

to influence the activity of the State." Carpenters, 463 U.S. at

830 (emphasis added). When the right deprived is one protected

against only official encroachment, a plaintiff must prove that

"the State was somehow involved in or affected by the

conspiracy." Id. at 833 (emphasis added). Claims brought

specifically under the deprivation clause of 1985(3) -- that

is, alleging that a private conspiracy is aimed at the

deprivation of a constitutional right -- must therefore allege

that the right infringed is one guaranteed against both official

and private encroachment. Id. (emphasis added); Bray, 113 S. Ct.

at 758 (affirming that claims under the deprivation clause must

allege a right protected against both private and official

encroachment). When a claim is brought under the hindrance

clause -- that is, alleging a conspiracy to hinder or impede law

enforcement officials from securing equal protection of the laws

to a class of citizens -- the same constitutional and policy

-47-

concerns are not triggered. The hindrance clause, unlike the

deprivation clause, implicates the ability of the State to ensure

and safeguard rights protected against any infringement. When

private individuals conspire for the purpose of arresting or

impeding the State's power to protect or secure equal protection

of the laws to a group of citizens, those conspirators are

supplanting the State's conduct with their own. It seems clear

to us that such a conspiracy is precisely the type that the

Carpenters Court was referring to when it discussed a conspiracy

"to influence the activity of the State" and thereby prevent it

from securing equal protection of the laws to its citizens.

Carpenters, 463 U.S. at 830. When the State's conduct is thus

arrogated, state action is clearly implicated, and rights

protected only against official infringement are likewise

implicated.

Moreover, because the hindrance clause applies only to

conspiracies to hinder or impede state officials, it does not

raise the same "specter of federalizing general tort laws," one

of the major concerns expressed in Griffin and Carpenters.

National Abortions Fed'n, 8 F.3d at 685. The hindrance clause

provides a cause of action only where the purposeful hindering of

state officials was directed at denying or infringing on the

rights of a group of citizens; it is, therefore, considerably

narrower by its own terms than the deprivation clause, and could

not be used to vindicate ordinary trespasses or torts in federal

court. See id.

-48-

We therefore hold that claims brought under the

hindrance clause of 1985(3) do not require that the right

allegedly infringed be one guaranteed against private

encroachment, but need only be one guaranteed against official

encroachment.

This is not to say that any action which delays,

impedes or hinders law enforcement officials is actionable under

the hindrance clause. The right infringed as a result of the

conspiracy must be constitutionally protected or guaranteed, and

the purpose, not merely the effect, of the conspiracy, must be to

impede state officials in their efforts to secure equal

protection of the laws.

Applying these principles here, we examine the record

to determine if Appellants have shown sufficient evidence to

raise a genuine dispute over whether Appellees intended to hinder

law enforcement officials from securing to women their

constitutionally protected right to abortion. Appellees contend

that there is no evidence that they intended to hinder police

efforts in any way. The testimony of Appellees Welch and Weslin,

however, belies this contention. Welch testified that their

purpose is to close down the clinics and thereby prevent

abortions. Weslin admitted during his testimony that one of the

reasons that the protesters intentionally go limp or flail their

limbs when arrested by the police is to make it more difficult

and time-consuming for the police to arrest them, thereby "buying

time" for the unborn.

-49-

This evidence of the Appellees' statements and tactics,

while not conclusive, is certainly sufficient to raise a genuine

dispute as to whether Appellees' intent was to hinder law

enforcement officials, an issue of fact material to the

Appellants' claims. We therefore hold that summary judgment was

improperly granted, and remand these claims to determine whether

Appellees intended to hinder law enforcement officials from

securing to women their right to obtain abortions.18

IV. CONCLUSION IV. CONCLUSION

For the foregoing reasons, we affirm in part, dismiss

in part, and reverse and remand for proceedings consistent with

the instructions stated in this opinion.



18 Appellees also contend that there is no evidence in the
record that a conspiracy exists among them. This contention
simply has no merit. The evidence indicates that the blockades
are mobilized on a large scale, with many individuals acting in
an tightly organized, disciplined fashion. The overt acts of the
alleged conspiracy include: mobilizing, organizing, and
orienting all the blockades' participants; transporting
participants to the clinics; ordering the "mangled-fetus"
stickers used to deface clinic property; organizing and preparing
banners and placards used to block clinic entrances; drafting and
distributing press releases to recruit participants; arranging
and financing travel to Puerto Rico; and the delay tactics
described above. All of this evidence raises at least a genuine
issue as to whether a conspiracy exists, and we therefore find
that summary judgment was improperly granted.

-50-